## STATE v. A. C. TOWNLEY AND ANOTHER.

### STATE v. SAME.[1]

July 5, 1918.

Nos. 20,926, 20,927.

**Discouragement of enlistment — violation of act.**

1. Defendants indicted jointly, charged with violations of chapter 463, Laws 1917, joined in a general demurrer to the indictment, which was overruled and the proceeding certified to this court for determination. The matter set forth in the indictment considered and *held* not to constitute a violation of the statute.

**Same — title of act.**

2. The subject matter of section 3 is within the title of the act.

A. C. Townley and Joseph Gilbert were indicted by the grand jury of Martin county under Laws 1917, p. 764, c. 463, of the crime of publishing and circulating a certain pamphlet which advocated that men should not enlist in the military or naval forces of the United States, and that citizens of Minnesota should not assist in prosecuting the war with public enemies of the United States. The case was tried in the district court for that county before Tifft, J., who overruled defendants' demurrer to the indictment, and certified the case to the supreme court upon the questions set out in the first paragraph of the opinion. Reversed and remanded.

[1] Reported in 168 N. W. 591.

*Clifford L. Hilton,* Attorney General, *James E. Markham,* Assistant Attorney General, and *Albert R. Allen,* County Attorney, for the state.

The essential question is: Is the natural and reasonable effect of the language such as to deter men from enlisting? As said in the Holm case,[1] if it impugns the motives which induced the President and Congress to enter into the war and attempts by unfounded and unwarranted assertions to incite opposition to the war and to create a feeling that we have been brought into it for mercenary and unworthy purposes, it is within the statute. It should be clear, almost without discussion, that the whole tenor of the article, like the article in the Holm case, is calculated to incite opposition to the war and to deter men from enlisting or otherwise aiding in carrying on the war.

To approach an American citizen, particularly one who is within the selective draft or one outside the draft who is contemplating voluntary enlistment, and state to that person that this war is largely a convulsive effort on the part of the adroit rulers of the warring nations for control of a constantly diminishing market, surely tends to dampen the ardor of the hearer and cause him to hesitate before enlisting. To state further to such person that this war is caused by rival groups of monopolists playing a deadly game for commercial supremacy, is surely calculated to deter the hearer from engaging in such a pernicious and deadly game. To continue and state to that person, that the war is a horrible slaughter and that above all its contributory causes rise preeminent the ugly incitings of an economic system based upon exploitation, is not only calculated to frighten such person from enlisting, but attempts by unfounded and unwarranted assertions to incite opposition to the war and to create a feeling that we have been brought into it by unworthy motives. Add to all this the statement that men are being conscripted while blood-stained wealth, coined from the suffering of humanity, is exempted, contrary to the spirit of America and contrary to the ideals of democracy, is surely calculated to impugn the motives of the President and Congress and incite opposition to the war.

[1] 139 Minn. 267, 166 N. W. 181.

*Frederic A. Pike, Thomas V. Sullivan, H. A. Paddock* and *Arthur Le Sueur,* for defendants.

Section 3 of the 1917 act is void, as not being within the subject matter expressed in its title. Cooley, Const. Lim. (7th ed.) 212.

The acts alleged in the indictment as having been committed by the defendants, i. e., the publication of the matters set forth therein, are within the rights of the defendants as defined and established by the Constitution of the United States and by the Constitution of Minnesota.

It was the intention of the framers of the Federal Constitution that the pre-existing rights of liberty of the press and freedom of speech should be protected against limitation, abridgement or violation. The assertion of the inherent rights of free utterance meant a denial of the right of control of speech or press not only to kings and royal governors, but just as fully a denial of such control to any who should wield official power in representative governments chosen by the people themselves. In Massachusetts, Virginia and Pennsylvania and elsewhere, one or another group of colonists had in the early days attempted and enforced such repression on their fellow colonists. . Such repression was to cease utterly in the full recognition by the new government of the universal inherent rights of man. In a word, it was the universal intent, the unanimous desire of the American people, that their new experiment in government, being an experiment in self-government, should be so constituted that every individual should be absolutely free, and absolutely secure in freedom, from the discarded restraints upon the right to discuss governmental affairs, and that this security in freedom should obtain alike against the one or the many, alike against individuals in office and majorities at the polls, to the end that every sovereign citizen of the republic should be freely heard to praise, to counsel or to condemn. This is seen in the several Constitutions adopted after the Declaration of Independence:

In 1776. Maryland, Const. art. 38; North Carolina, Const. arts. 15, 18; Pennsylvania, Const. Declaration of Rights, art. 12; Virginia, Bill of Rights, sec. 12. In 1777. Georgia, Const. art. LXI; Vermont, Const. Declaration of Rights, 14. In 1778. South Carolina, Const. art. 43.

In 1780. Massachusetts, Const. Part 1, art. 16; New Hampshire, Const. Part 1, art. 22. 1789. Georgia, Const. art. 4, § 3. In 1790. Pennsylvania, Const. art. 9; South Carolina, Const. art. 9, § 6.

In view of these developments it follows necessarily that the English common law of indictment for libel of government or court was not adopted in the several states. "If we are correct in this it would not be in the power of the state legislature to pass laws which should make mere criticism of the Constitution or of the nature of government a crime, however sharp, unreasonable and intemperate it might be." Cooley, Const. Lim. (7th ed.) 614.

Quinn, J.

These two prosecutions involve the same questions and are considered and disposed of together in one opinion. Defendants were jointly indicted by the grand jury of Martin county and thereby charged by two separate indictments of violations of chapter 463, p. 764, Laws 1917. Defendants joined in general demurrers to each indictment, which were overruled by the trial court. Whereupon, at the instance of defendants, the proceedings were certified to this court for the determination of two questions, applicable to both, namely: (1) Is section 3 of the statute on which the indictments are founded invalid as not within the subject of the act as expressed in its title? and (2) Do the facts stated in the indictment constitute a violation of the statute?

In the view we take of the second question, we make but brief mention of the first. The title to the act names as the subject thereof the interference with or discouragement of enlistments in the military or naval forces of the United States, or of the state of Minnesota. Section 3 declares it unlawful to advocate or teach by written or printed matter or by oral speech that citizens of this state "should not aid or assist the United States in prosecuting or carrying on war." The contention is that the prohibition against advocating that the citizen should not aid or assist in the prosecution of the war is not within the title of the act, which names only the interference with enlistment, and is therefore invalid. Whether the provisions of section 3 have reference only to the sale of bonds and stamps, or include as well interference by written or printed matter or by oral speech, otherwise than prohibited by the former sections of the act, we think the substance of the pro-

visions of section 3 within the scope of the title to the act, and we so hold. Without further reference thereto we come directly to the second question, namely, whether the facts stated in either indictment show a violation of the statute, considering that they are founded in part at least upon section 3.

1. The indictment in case No. 20,927 charges that at the time and place stated therein the defendants wilfully and unlawfully advocated that citizens of the state should not aid the United States in carrying on the war with the public enemies thereof, and to that end and for that purpose did publish and circulate a certain printed leaflet or folder containing, among other things, the following:

"The moving cause of this world war was and is Political Autocracy used to perpetuate and extend Industrial Autocracy. It is the struggle of political overlords to extend and perpetuate their power to rob and exploit their fellowmen. Autocratic rulers who have robbed and exploited the fathers and mothers now slaughter the children for the single purpose of further entrenching themselves in their infamous position and securing and legalizing their possession of the fruits of others' toil and thrusting the world under the yoke of political auto-cracy, which is ever the shield and the mask of Industrial Autocracy."

This language and the statements or assertions thereof are to be considered and construed in connection with facts of general notoriety and of common knowledge, and in that atmosphere and light we are to determine whether the natural tendency thereof is the discouraging of enlistment in the present war, or the advocacy that assistance should not be extended the Federal government in the prosecution of the same. If such be the natural tendency and effect of the language defendants are presumed to have so intended, and the conclusion necessarily would follow that the demurrer to the indictment was properly overruled. And the same result would follow if the language set out in the indictment, considered in the same light, leaves the question of the natural tendency thereof in the respect stated, and the purpose of defendants in circulating the same in doubt, for in such case the question would be one of fact or mixed law and fact for the consideration and determination of a jury. But our conclusion in the matter is that the language, properly considered and taken in the light of the surrounding pertinent

140 M.—27.

facts cannot be held as tending to discourage enlistment in the army or otherwise to advocate that assistance should not be rendered the government in the prosecution of the war; nor is the matter left in such doubt or uncertainty as to make the question one of fact. The matter complained of treats of the origin of the present war between the German Empire and its allies on the one hand, and France and her allies on the other, the cause, purpose and probable consequences thereof, coupled with the condemnation of those responsible for bringing the curse upon the people. It is a matter of common knowledge that the military autocracy of Germany and Austria caused and brought on the war, and it has been obvious from the beginning that the purpose and object thereof was territorial expansion, and thereby to subject to the authority of those governments peoples of other lands and countries. The language quoted from the indictment is an accurate characterization of the German-Austrian military machine and of the purposes intended to be accomplished, as indicated and shown by facts of common repute at the time the matter was published and circulated by defendants, namely, in September, 1917. It contains no reference to the United States government, nor to the President or the Congress, or others in official authority, and the language used has no application to either. We have in this country no political autocracy, and no autocratic rulers, such as they have in some of the European governments engaged in and which are wholly responsible for the war. The language makes no reference to enlistments or the otherwise formation of an army by the United States, nor can anything therein contained be construed as advocating nonassistance in the prosecution of its aims and purposes in entering into the conflict. The language therefore can have no reference or application to the participation of the United States in the war, at least not in discouragement of enlistment nor in advocacy of withholding aid and assistance in the prosecution of the same. A verdict declaring to the contrary could not be sustained.

The object of the legislature in the enactment of this statute was not that the state should wholly take over the burden of prosecutions of the kind, which primarily are of Federal cognizance. The purpose was to aid the Federal authorities in the prevention and suppression of sedition and like conduct on the part of persons whose tendency to criticism and condemnation of all things governmental leads them to the

border line of treason and sedition. State v. Holm, 139 Minn. 267, 166 N. W. 181.

For adjudications as to what acts or things done or said will constitute a violation of statutes of this kind we look to the Federal courts, for in reality it is the Federal government and its authority that are challenged by seditious conduct, rather than state authority, and the courts thereof constitute the proper tribunal for the establishment of rules guiding such cases. Few recent adjudications of those courts are to be found in the reports. But the decisions which might be cited will not permit of a conviction on vague inference or innuendo. Masses Pub. Co. v. Patten, 245 Fed. 102, 157 C. C. A. 398; U. S. v. Baker, 247 Fed. 124; U. S. v. Hall, 248 Fed. 150; Ex parte Milligan, 4 Wall. 2, 18 L. ed. 281. For the reasons stated we hold that the facts pleaded in the indictment do not constitute a violation of the statute.

2. The same conclusion must be reached as to the other indictment. The excerpts from the leaflet or circular set out in the indictment, which defendants are charged with circulating for the purpose of deterring enlistments, and in advocacy of nonassistance to the government in support of the war, purport to be a set of resolutions passed and adopted on June 7, 1917, by a political organization known as the National Nonpartisan League. They were printed with other matter in one pamphlet and distributed and circulated by defendants at the time and place stated in the indictment. For the purpose of a clear understanding of the matter so circulated, we set out the resolutions in full, as they appear in the indictment:

"RESOLUTIONS ON THE WAR BY NATIONAL NONPARTISAN LEAGUE.

"Our country being involved in a world war, it is fitting that the National Nonpartisan League, while expressing its loyalty and willingness to support the government in its every necessity, should declare the principles and purposes which we as citizens of the United States believe should guide our nation in the conduct of the war.

"Whatever ideas we as individuals may have had, as to the wisdom of our nation engaging in this war, we realize that a crisis now confronts

us, in which it becomes necessary that we all stand unreservedly pledged to safeguard, defend and preserve our country.

"In making this declaration of our position, we declare unequivocally that we stand for our country, right or wrong, as against foreign governments with whom we are actually engaged in war. Still we hold that when we believe our country wrong, we shall endeavor to set her right.

"The only justification for war is to establish and maintain human rights and interests the world over. For this reason we are opposed to waging war for annexation, either on our part or that of our allies, or demanding indemnity as terms of peace. Bitter experience has proved that any exactions, whether of land or revenue, serve only to deepen resentments and hatreds, which inevitably incite to future wars.

"We therefore urge that our government, before proceeding further in support of our European allies, insist that they, in common with it, make immediate public declaration of terms of peace, without annexation of territory, indemnities, contributions or interference with the right of any nation to live and manage its own internal affairs, thus being in harmony with and supporting the new democracy of Russia in her declaration of these fundamental principles.

"We demand of no nation any concession which should be hid from the world. We concede to no nation any right of which we are ashamed. Therefore we demand the abolition of secret diplomacy. The secret agreements of kings, presidents and other rulers, made, broken, or kept without the knowledge of the people, constitute a continual menace to peaceful relations.

"We demand that the guarantees of human conservation be recognized, and the standard of living be maintained. To this end we demand that gambling in the necessaries of life be made a felony, and that the Federal government control the food supply of the nation and establish prices for producer and consumer.

"As a direct result of the war, private corporations in our country have reaped unparalleled profits. The net earnings of the United States Steel Corporation for 1916 were $271,531,730, as against $23,496,86 in 1914, an increase of $248,034,962. (863)

"The Du Pont Powder Company shows a similar record. Its ne

earnings for 1916 were $82,107,693, as against $4,831,793 in 1914, an increase of $77,275,900.

"We are unalterably opposed to permitting stockholders of private corporations to pocket these enormous profits, while at the same time a species of coercion is encouraged toward already poorly paid employees of both sexes, in urging them to purchase government bonds to help finance the war. Patriotism demands services from all according to their capacity. To conscript men and exempt the bloodstained wealth coined from the sufferings of humanity is repugnant to the spirit of America and contrary to the ideals of democracy.

"We declare freedom of speech to be the bulwark of human liberty, and we decry all attempts to muzzle the public press or individuals, upon any pretext whatsoever. A declaration of war does not repeal the Constitution of the United States, and the unwarranted interference of military and other authorities with the rights of individuals must cease.

"The contributory causes of the present war are various; but above the horrible slaughter loom the ugly incitings of an economic system based upon exploitation. It is largely a convulsive effort on the part of the adroit rulers of warring nations for control of a constantly diminishing market. Rival groups of monopolists are playing a deadly game for commercial supremacy.

"At the close of this war sound international standards must be established on the basis of a true democracy. Our economic organizations must be completely purged of privilege. Private monopolies must be supplanted by public administration of credit, finance and natural resources. The rule of jobbers and speculators must be overthrown if we are to produce a real democracy; otherwise this war will have been fought in vain.

"Only in this spirit do we justify war, and only thus can lasting peace be established."

The question is whether these resolutions may be said to encroach upon or violate the prohibitions of the statute. No reference is made to enlistments in the American army, nor advice or suggestion made that assistance be not extended to the government. The resolutions are prefaced with expressions of loyalty, and declare the purpose of

the organization to stand by the government in the present crisis. The declaration of the loyalty and purpose of the association may be sham, as urged by the state, but we have no right to so assume. In the absence of something in the resolutions showing to the contrary, we are bound to treat the declaration as having been made in good faith. The declaration is followed by expressions in opposition to the waging of war for the purpose of indemnity or annexation of territory, and the United States government is urged to disclaim any such purpose. This is not obnoxious to the statute. There is a demand for the abolition of secret diplomacy, and condemnation of secret agreements by kings, presidents and other rulers, to be made, broken or kept without the knowledge or consent of the people. That in no way offends the statute. Then follow statements in reference to the profits made by certain manufacturers of war materials, and a demand that those thus profiting by the war contribute to the expense thereof in proportion to such profits as compared with poorly paid employees. Patriotism, the resolutions declare, "demands services from all according to their capacity." That is all true, but the assertion of the facts as to profits by dealers in war material, and the demand that they contribute to the expense of the war in proportion thereto, in no proper view can be said to discourage enlistment, or the purchase of government bonds by employees. The resolutions proceed with declarations of freedom of speech, and that a declaration of war does not repeal the Constitution. A demand is made that interference by military and other authorities with individuals should cease. We do not know to what this may refer, though it cannot, standing alone, be held to constitute an intended or other interference with the government's military operations.

Here follows some reference to the contributory causes of the war, with the statement that "above the horrible slaughter loom the ugly incitings of an economic system based upon exploitation. It is largely a convulsive effort on the part of the adroit rulers of warring nations for control of a constantly diminishing market. Rival groups of monopolists are playing a deadly game for commercial supremacy." And, in closing, the resolutions declare that at the end of the war sound international standards must be established on the basis of true democracy, completely purging economic organizations of class privileges, and that

the rule of jobbers and speculators must be overthrown if we are to have a real democracy. Just what is meant by the effort of adroit rulers to control a diminishing market is not clear, but the statement is not a violation of the statute.

Nor can it be held that the resolutions taken as a whole support the charge. The court cannot inject by inference matter of substance between the lines of the resolutions, and predicate a conviction thereon, for the fact and not the prosecutor's inferences must be the basis of a conviction under the statute. The resolutions taken as a whole appear to be nothing more serious than a rhetorical, and somewhat flamboyant, platform upon which a certain class of citizens are solicited to join an organization whose avowed purpose is the amelioration of the alleged evils of present economic conditions, and to bring about a more equal distribution of the wealth of the world among all classes of mankind. The pursuit of this object does not violate the statute in question. U. S. v. Pierce, 245 Fed. 878, is not in point. It is perhaps not out of place to say that the resolutions have not yet attracted the attention of the Federal authorities.

On the whole our conclusion is that the demurrers to both indictments should have been sustained. We answer the certified questions accordingly and remand the causes to the court below for further proceedings.

Reversed.