## STATE v. A. C. TOWNLEY AND ANOTHER.[1]

April 29, 1921.

No. 22,086.

**Conspiracy to discourage enlistment.**

    1. To establish a charge of a conspiracy to violate chapter 463, Laws 1917, the state must prove that defendants had concerted to teach that men should not enlist in the military forces of the United States or aid in carrying on the war with Germany. A combination for an unlawful purpose is the foundation of the offense and an overt act in furtherance of such purpose completes the offense. All who are parties to the combination incur guilt when one does such an act. The combination need not be established by direct evidence, but may be inferred from circumstances.

**Conviction supported by evidence.**

    2. The evidence, direct and circumstantial, was sufficient to support the verdict.

[1]Reported in 182 N. W. 773.

**Conviction not reversed on appeal for technical errors.**

3. If guilt is clearly established, a criminal conviction will not be reversed for technical errors, where the substantial rights of the accused have not been so violated as to make it reasonably clear that a fair trial was not had.

**Separate trials of defendants jointly indicted.**

4. It is discretionary with the trial court to grant separate trials of defendants jointly indicted for a misdemeanor.

**Cross-examination not unduly restricted.**

5. Defendants were not unduly restricted in their cross-examination of the state's principal witness.

**Reasons for change of sentiment of witness for state.**

6. The reasons for a change from friendly to unfriendly sentiments on the part of a witness for the state having been inquired into on his cross-examination, it was not error to permit the state to further develop the subject within reasonable limits.

**New trial because of doubtful relevancy of evidence.**

7. The admission of evidence of doubtful relevancy, is not alone sufficient ground for a new trial, where there was ample competent evidence to warrant the jury's conclusion respecting defendants' guilt.

**Rulings on evidence.**

8. There were no errors in rulings admitting or excluding evidence.

**New trial because of misconduct of court or counsel.**

9. Defendants are not entitled to a new trial on the ground of misconduct on the part of the court or opposing counsel.

**Requests for instructions submitted near end of argument.**

10. It was within the discretion of the trial court to receive and consider defendants' requests for instructions not submitted until near the end of the argument of the prosecuting attorney, notwithstanding the request of the court, made several days before, that the attorneys present their proposed instructions in time to enable the court to consider them. Section 7802, G. S. 1913, is applicable to the trial of criminal as well as civil actions.

**Accused not to make unsworn statement to jury.**

11. Since the accused may now testify in his own behalf, if he desires, the courts should no longer follow or recognize the practice obtaining at common law of permitting him to make an unsworn statement to the jury at the close of the case.

**Accused not to make closing argument after colorable discharge of counsel.**

12. There is no constitutional provision conferring upon the accused the right to make the closing argument to the jury in his own behalf. He is guaranteed the right of having the assistance of counsel for his defense, and counsel cannot be imposed upon him against his will, but, if he elects to be represented by counsel who conduct the defense until the time comes to make the argument to the jury, he cannot ostensibly discharge them and then insist on making the closing argument himself, especially where he did not take the stand as a witness. It is within the discretion of the trial court to permit him to do so, and, under the facts disclosed by the record, it did not abuse its discretion in refusing such permission.

After the former appeal reported in 142 Minn. 326, 171 N. W. 930, the case was tried before Dean, J., and a jury, and defendants were found guilty as charged in the indictment. From an order denying their motion for a new trial, defendants appealed. Affirmed.

*George Hoke, George Nordlin* and *Vince A. Day*, for appellants.

*Clifford L. Hilton*, Attorney General, *James E. Markham*, Assistant Attorney General, and *E. H. Nicholas*, County Attorney, for respondent.

LEES, C.

Defendants were indicted in Jackson county in May, 1918, on a charge of criminal conspiracy. The substance of the indictment and the questions raised by their demurrer to it are reported in State v. Townley, 142 Minn. 326, 171 N. W. 930. Defendants were brought to trial in June, 1919. The trial lasted three weeks and resulted in a verdict of guilty. They moved for a new trial. On July, 1920, their motion was denied and they appealed, specifying 102 alleged errors. Some of the assignments are not of sufficient importance to justify discussion, but none have escaped our careful consideration. Some have been combined for examination and others will be considered separately.

1. The objections to the constitutionality of Chapter 463, p. 764, Laws 1917, which are first in order, were disposed of in State v. Gilbert, 141 Minn. 263, 169 N. W. 790, affirmed in Gilbert v. Minnesota, 254 U. S. 325, 41 Sup. Ct. 125, 65 L. ed.

1Reported in 182 N. W. 773.

2. To establish the guilt of the defendants, the state was required to prove that they had conspired to teach or advocate that men should not enlist in the military or naval forces of the United States, or that citizens of Minnesota should not aid the United States in carrying on the war with Germany, and that some act had been done by one or both to effect the object of the conspiracy. Sections 8595, 8596, G. S. 1913.

The combination of two or more minds in an unlawful purpose is the foundation of the offense, but an overt act in furtherance of the common purpose is necessary to complete it. The statement to the contrary in State v. Pulle, 12 Minn. 99 (164), is no longer the law in view of the provisions of the statute. All who are parties to the combination incur guilt when any one of them does an act to further the purpose of the unlawful confederation. State v. Thaden, 43 Minn. 253, 45 N. W. 447; State v. Palmer, 79 Minn. 428, 82 N. W. 685; State v. Dunn, 140 Minn. 308, 168 N. W. 2; State v. Lyons, 144 Minn. 348, 175 N. W. 689; Hyde v. U. S. 225 U. S. 347, 32 Sup. Ct. 793, 56 L. ed. 1114, Ann. Cas. 1914A, 614.

The combination need not be established by direct evidence. It may be inferred from circumstances. No formal agreement to do the acts charged need be shown. Concurrence of sentiment and co-operative conduct and not formality of speech are the essential ingredients of criminal conspiracy. Redding v. Wright, 49 Minn. 322, 51 N. W. 1056; Eacock v. State, 169 Ind. 488, 82 N. W. 1039; State v. Caine, 134 Iowa, 147, 111 N. W. 443; Marrash v. U. S. 168 Fed. 225, 93 C. C. A. 511; Underhill, Crim. Ev. § 491.

To sustain the charge, the state introduced both direct and circumstantial evidence of the alleged conspiracy and made proof of defendants' acts alleged to have been done in furtherance of it. Those done in Jackson county were the acts of Gilbert alone, for it does not appear that Townley was ever in that county prior to the return of the indictment, but nevertheless the venue might properly be laid in Jackson county. Hyde v. U. S. supra.

The direct evidence of conspiracy consisted of the testimony of one F. A. Teigen, which in substance was as follows: He made Townley's acquaintance at Fargo in the winter of 1916, and Gilbert's at St. Paul somewhat later. They employed him as an organizer, under a contract

running for one year, to procure members of the Nonpartisan League and to collect membership fees. Before he was employed, Townley told him he had conceived of and built the league himself and had the final decision as to its policy. Defendants were together at league headquarters in St. Paul, where both had offices. Townley was president and Gilbert had charge of the organization work of the league. Teigen took orders from both. He discussed with Townley a speech which one Van Lear made at a meeting in his territory, and asked whether he should participate in another meeting at which Van Lear was to speak. Townley replied that the Van Lear speech was a "cracker-jack," and in the same connection said: "We are against this God-damned war, but we can't afford to advertise it." He advised him not to take part in the proposed meeting. Teigen had prepared a speech which he intended to deliver, and discussed it with defendants. Gilbert thought it was all right, but Townley said it was too direct, that it should be camouflaged a little, and added:

"Don't write or say or do anything that they can get you for, that is, any open opposition to the war. It is far better to let your position be known and understood by indirect methods."

Late in the summer of 1917, letters of instruction were mailed to league organizers, expressing loyal sentiments. Townley told Teigen they were sent out to show that the league was patriotic, but that the real instructions would come by word of mouth from traveling agents. Gilbert expressed opposition to all wars, on principle. Townley's opposition was based on policy rather than principle. Both told Teigen that the cost of the war should not be met by the sale of bonds—that it was absolutely wrong, a mistaken policy on the part of the government. In the fall of 1917 Gilbert informed Teigen that the Public Safety Commission had asked that his further services be dispensed with. Townley said to him:

"Somebody has got to be sacrificed to appease them and you are the man that they are very bitter against so we have got to discharge you. * * * And I am going out, I have got to go out. I am compelled to, and make patriotic speeches, and I have ordered all of the other men * * * to do the same thing, because if we don't they are going to get us."

Gilbert admitted that he had talked with Teigen about the war, expressing his personal opinion, but denied that he told him what to teach. He admitted that Teigen had shown him his proposed speech, but denied that he had approved of or discussed it with Townley. He also admitted that he had signed Teigen's contract in behalf of the league.

Townley did not testify.

The sum and substance of Teigen's testimony was that the defendants were in accord in their purpose to discourage the prosecution of the war; that they planned to oppose it and to use their organization to accomplish that end. Defendants characterize his testimony as a tissue of falsehoods. Granting that he is a man of doubtful veracity and the defendants' enemy, it nevertheless appears that defendants did and said in public substantially what he asserts they told him in private they were going to do and say. Their conduct and utterances square with his testimony and lend it credit, which otherwise it might not be entitled to receive. The jury who heard him testify, and saw him undergo a searching cross-examination, were evidently convinced that he was not unworthy of belief.

The relations of the defendants to each other and to the organization they were promoting, the printed matter they distributed, and their public speeches, comprise the circumstantial evidence of the existence of the alleged conspiracy. This was the situation: When the United States declared war, defendants were, and for some time had been, engaged in enlarging the membership and field of activity of the Nonpartisan League. It was a political organization, seeking to gain control of the government of a number of states, in order to put through an economic program advocated by its leaders. Defendants were conspicuous and influential members of a small group of men who controlled the organization. The entry of the United States in the war interfered with their program and naturally diverted public attention to greater and more momentous issues than the alleged economic grievances of the class of citizens which the organizers of the league proposed to redress. It was inevitable that during the continuance of the war a consideration of these grievances would be postponed. The war was unpopular in many localities. It would be easier to sell memberships in such localities, if the impression prevailed that the officers of the league proposed to use the influence of

a powerful organization to keep young men from being sent overseas.

Soon after war was declared a pamphlet was printed and placed in the hands of the league's field workers. It was composed of three distinct parts. The first sets forth the league's origin and method of operation; the second contains resolutions on the war adopted by the league; and the third states the principles of the league. It was prepared at Gilbert's suggestion, to be used in getting members, and he admitted that he was absolutely in accord with the ideas expressed in it. There can be no reasonable doubt that Townley, as president of the league, was cognizant of the pamphlet and its circulation, and the inference is that he approved of it. The war resolutions contained in it are set out in State v. Townley, 140 Minn. 413, 168 N. W. 591, where it was held that they did not violate chapter 463, p. 764, Laws 1917. They were, however, a criticism of the policy of conscripting men and not wealth, and of the alleged unwarranted interference of military authority with the rights of individuals. We are of the opinion that the pamphlet was properly received in evidence. Pierce v. U. S. 252 U. S. 239, 40 Sup. Ct. 205, 64 L. ed. 542.

Defendants made numerous speeches in different parts of the state during the summer and fall of 1917 and the winter of 1918. Occasionally both were present at the same meeting. Both participated in and spoke at one held in St. Paul in September, 1917. Some of their speeches are contained in the record. Among them is Gilbert's Kenyon speech, referred to in the opinion in State v. Gilbert, 141 Minn. 263, 169 N. W. 790, affirming his conviction for a violation of chapter 463. In Gilbert v. Minnesota, 254 U. S. 325, 41 Sup. Ct. 125, 65 L. ed —, Mr. Justice McKenna, speaking for the Supreme Court of the United States, in sustaining the decision of this court, said [page 333]:

"Gilbert's speech had the purpose they (the sections of the statutes) denounce. The nation was at war with Germany, armies were recruiting, and the speech was the discouragement of that. * * * Every word that he uttered in denunciation of the war was false, was deliberate misrepresentation of the motives which impelled it, and the objects for which it was prosecuted. He could have had no purpose other than that of which he was charged."

On January 18, 1918, a letter was addressed and sent to A. E. Bowen,

an officer of the league. It was signed by the county director of public safety for Jackson county and by the sheriff. It requested Bowen to keep league speakers out of the county, stating that any attempt to hold further league meetings in the county would be likely to result in disturbances, and that every measure at the disposal of the writers would be used to prevent such meetings. It was written in response to a letter from Bowen announcing a league meeting in Jackson county on January 23. Taking the letter with him, on that day Gilbert went to Lakefield, where the meeting was to be held. He met a number of county officials, including the sheriff. Exhibiting the letter to them, he said he was the manager of the league, and deemed the matter referred to in the letter so important that he had come himself rather than send a subordinate. He was informed that a league organizer named Freitag had been going about the county holding meetings and influencing people in such a way that it was hard to get them to buy Liberty bonds. He replied that he was not responsible for what organizers did; that he was going to hold a meeting; that the authorities would have to arrest him if they intended to stop him; that he had been sent down to test the law; that the case would be carried to the highest court in the land, and that they had plenty of money to do it. He then proceeded to make his speech, but before he concluded he was placed under arrest. The speech was of the same general nature as his Kenyon speech. The sheriff testified that in substance Gilbert said that

"The boys of the farm * * * should be left on the farms, that they are better off on the farms than they are in the trenches five thousand miles away. Who is going to feed them when they are five thousand miles away? You farmers have worked harder than ever before. You have had to subscribe to the Liberty Loan, Y. M. C. A., and to the Red Cross; and on top of all that, now they take your boys away. When the government conscripted your boys, they didn't conscript wealth. If they had, we wouldn't have to have wheatless days and meatless days, and heatless days. * * * Men had never been drafted to be sent across the sea to fight. * * * The county officials were a lot of * * * flag-wavers and that they wrapped themselves up in the Stars and Stripes and spelled their patriotism with big letters P-A-Y."

The man Freitag, referred to in the Bowen letter, was a league or-

ganizer working in Jackson county. In soliciting members, he said in substance that the war was a moneyed man's war; that if it wasn't for money we wouldn't be at war; that a meeting had been called to send a petition to the government to keep the boys from being sent across to fight. At a public meeting at Sioux Valley, he said England and France were bankrupt and this country soon would be if it kept on spending such large sums of money, and advised farmers not to invest in Liberty bonds, but in elevators, flour mills and things essential to their interests. This was just before the probate judge of the county made a speech urging the purchase of Liberty bonds.

Townley's speeches bear a marked resemblance to Gilbert's, both in the ideas expressed and the language used, though he was not so outspoken. His St. Paul speech in September, 1917, is referred to by his counsel as typical of his speeches in general. In the course of that speech, referring to the steel, packing and milling business, he said:

"Take as much profit out of their business as has been taken out of the business of raising wheat in the northwest. * * * Now, as soon as you do that, nobody will want to continue the war any longer unless to secure liberty and democracy. * * * Fix a price on steel on the same basis and by the same power as you have fixed the price on the farmer's wheat * * * and this patriotic corporation won't want to continue the war except for liberty and democracy. * * * If your government * * * should be able to fix the price of steel and flour so that those gentlemen would make no more * * * than the farmer is making out of wheat, I'm afraid that the Minneapolis Journal would be one of the worst slackers in the whole United States."

In another portion of this speech, he said:

"We got the government control too largely into the hands of the profiteers. They are today influencing this government in too large a measure. * * * An influence so large that they can say * * * we are going to have forty billions of dollars to spend here to prosecute this war. Now, how much have we got to pay the farmers for wheat to keep bread in the boys' stomachs? All that we don't have to pay for wheat to keep bread in the boys' stomachs we can use to pay profits to ourselves."

In another portion, he said:

"The kept press, the newspapers owned by those who make four or five billion dollars, and the mouths of some gentlemen have been very full of profession of their patriotism, but too many of those professions of patriotism come from men whose pockets bulge with the gold they stole from us. They are not patriots because they possess billions and billions of war profits wrung from the agony and sweat and toil of men and women. The possession of these billions of dollars of war profit in the pockets of these profiteers, their arms red to the elbows in the blood of this nation, is proof that they are not patriots.  *  *  *  Then, in a time of the world crisis, in a time of the nation's need, if they are not patriots, what in hell are they? Who has a German helmet placed upon their heads and you see the Kaiser himself."

In a speech at New Ulm in June, 1917, he said:

"Then they ask us to purchase Liberty bonds? How about that $4,000,000,000 in excess profits the people of this country have paid? *  *  *  This is double the size of the Liberty bond quota. The people of this country are paying tribute to the gamblers on account of war and then are asked to pay for the war besides.  *  *  *  I say that we must free this country from autocracy before we go to Europe to do the same thing.  *  *  *  I don't believe it is right to give the best lives of the nation, and at the same time put the nation millions in debt; and ask these boys to come back and work long years to pay off the war debt.  *  *  *  When the war is over these young men will come back *  *  *  with limbs gone, deaf, dumb, blinded, insane for life. Hundreds of thousands more, millions, will not come back at all.  *  *  * So we propose that, as there is a God in heaven, these men are not coming back maimed and in poverty to pay off this horrible war debt; we will not shoulder on their backs this great burden. We will take the surplus wealth of the country now and use it for the war, and when the war is over we will give back what is left, and clean the slate.  *  *  * We must destroy American autocracy in this country before we attempt to relieve the people of Europe of the oppression of German autocracy. *  *  *  I am for liberty and for democracy, but not for a war to submit a people to robbery by a financial autocracy.  *  *  *  It is time for the American people to wake up and kick out this autocracy of

wealth which has fastened its clutches on the throat of liberty in this country. After this operation is completed it is time to talk of freeing Europe of German autocracy."

He further said:

"The government says you have to go across the seas to fight, and of course you will have to go and many of you will sacrifice your lives. Some of you will come back maimed and blind and your life will be destroyed, but why don't they draft the Big Biz? I say before we let you go over there, they should draft Big Biz into it and then there would be no fight."

In a speech at Glencoe in June, 1917, he said:

"I am afraid that if the nation should come to the * * * big corporations and want those who are making millions of wealth to give over their surplus I am afraid it might dampen their ardor for war a little bit. I am a little bit afraid that there might not be much of a war. * * * There is no reason why we should pay after the war is over some billions of dollars to the war profit when we are sending our boys over to die. Let's see whether this is right, to take our surplus wealth to finance this war. The rich man is not going to go, he is making the rules of the game. * * * We propose that this nation shall take so much of the surplus of this wealth of our nation and use it now and when the war is over give back as much of the wealth as is left and no more."

In a speech at Cambridge in February, 1918, he said that the war "was a rich man's war and for the benefit of the rich. * * * If the rich had to pay their proportionate share * * * with the farmer or poorer class, the war wouldn't last very long. * * * It wasn't right that we should send our boys over there to fight other people's battles."

These statements were intermingled with others pointing to the duty of every American citizen to support his government. No exception can be taken to many of the things he said, but his speeches are to be read as a whole. So read, the good in them is more than nullified by the bad. It is urged that they contained nothing calculated to discourage enlistments. Doubtless their only effect on right-thinking men was to excite their indignation, but with men who did not know why the United

States had engaged in the war and who were credulous enough to believe these statements, and especially among those who did not favor our entry in the war, they could have but one effect—the discouragement of enlistments and of subscriptions to government bonds.

When Teigen's testimony, if true, and the admitted acts and utterances of the defendants are put together, defendants' guilt is clearly established. We are of the opinion that the evidence to support the verdict is ample and that defendants are not entitled to a new trial on the ground that a conspiracy was not proved.

The remaining assignments all relate to errors of law alleged to have occurred in the course of the trial. In considering them, we apply the rule that a criminal conviction will not be reversed for technical errors where the substantial rights of the accused have not been so violated as to make it reasonably clear that a fair trial was not had, where, as here, the guilt of the accused is clearly established. State v. Nelson, 91 Minn. 143, 97 N. W. 652; State v. Crawford, 96 Minn. 95, 104 N. W. 768, 822, 1 L.R.A.(N.S.) 839; State v. Williams, 96 Minn. 351, 105 N. W. 265; State v. Brand, 124 Minn. 408; 145 N. W. 39; State v. Jacobson, 130 Minn. 347, 153 N. W. 845; State v. Price, 135 Minn. 159, 160 N. W. 677.

3. A separate trial of each defendant jointly indicted for a misdemeanor is discretionary with the court. G. S. 1913, § 9202; State v. Sederstrom, 99 Minn, 234, 109 N. W. 113. There was no error in the denial of defendants' request for such a trial.

4. The letter to Bowen was properly received in evidence. Gilbert had it in his possession when he went to Lakefield to speak. It furnished the occasion for his going there and he took some of the statements in it as the text for his speech. It threw light on the meaning and purpose of his utterances.

5. Freitag's statements, while soliciting members and making speeches in Jackson county, were properly received. True, he was only an organizer and not a party to the conspiracy, but defendants were not charged with criminal responsibility for what he said. Organizers received instructions from headquarters. According to Teigen, Townley decided what the instructions should be and Gilbert was in charge of the organization work. Freitag's talk expressed the same ideas as de-

defendants' speeches, but in less guarded language. The jury might properly infer that he was their mouthpiece and that his utterances indicated a concerted purpose on their part to discourage enlistments and the purchase of government bonds.

6. Calling attention to State v. Townley, 140 Minn. 413, 168 N. W. 591, defendants contend that the pamphlet put out by the officers of the league should not have been received in evidence. The question before the court in that case was whether the circulation of the pamphlet constituted a violation of chapter 463, p. 764, Laws 1917, with which defendants were charged. The present prosecution is for a conspiracy to violate that statute. In State v. Townley, 142 Minn. 326, 171 N. W. 930, we held that the indictment, under which the defendants have been tried and convicted, charged a conspiracy to violate the statute in question and not its actual violation. The circulation of the pamphlet was merely one of the acts done in furtherance of the conspiracy. Such an act need not amount to a crime. If that were so, no conspiracy to commit a crime could ever be punished, unless the conspirators actually committed it. U. S. v. Rabinowich, 238 U. S. 78, 35 Sup. Ct. 682, 59 L. ed. 1211; Pierce v. U. S. supra.

7. Defendants insist that they were unduly restricted in their cross-examination of Teigen. His feelings and disposition to tell or conceal the truth were proper subjects of inquiry, Alward v. Oakes, 63 Minn. 190, 65 N. W. 270, but the extent of the inquiry is largely within the discretion of the trial court. Goss v. Goss, 102 Minn. 346, 113 N. W. 690; State v. Nelson, 148 Minn. 285, 181 N. W. 850; Underhill, Crim. Ev. § 221. The cross-examination brought out the fact that, after he was discharged as a Minnesota organizer in the fall of 1917, Teigen published a book hostile to the league and its officers; that in June, 1919, he was employed as a league organizer in Wisconsin; that he had been jailed there on some charge made by a Wisconsin officer of the league; that within a few days after his release he sent a telegram to the county attorney, informing him where he was, and voluntarily came as a witness for the state at the county attorney's request. He was asked about his relations with prominent men in St. Paul and Minneapolis and whether they had paid or promised to pay him large sums of money for writing his book. Objections were sustained to this line of questions. Specifying

149 M.—2.

time and place, he was then asked whether he had not stated to three different men—Sullivan, Paddock and Anderson—that he was getting money from the enemies of defendants and that they still owed him a considerable sum. This he denied. Sullivan and Paddock later testified that he had made such statements. Anderson was also called as an impeaching witness. It developed that he was not the Anderson referred to when defendants were laying their foundation for impeachment. Permission to recall Teigen for further cross-examination, in order to lay such foundation, was refused. Before the cross-examination was concluded, Teigen's antecedents had been laid bare and his unfriendliness to defendants had been established. The trial court might well have permitted his recall to lay a foundation for impeachment by the witness Anderson, but we cannot say there was an abuse of discretion in refusing to permit it, or that Anderson's testimony would have added much to the weight of Sullivan's and Paddock's.

8. The state's witness Liesch published two newspapers in New Ulm. On cross-examination he was asked whether they were for or against the Nonpartisan League, and answered that they were for it up to 1917, but not thereafter; that the league had boycotted them, which was decidedly offensive to him; and that he was also hostile to the league because of its stand on the war. On redirect examination he was asked what other reasons there were for his change of sentiment towards the league. Over defandants' objection, he answered that he believed the league was managed by Socialists who were hostile to the war and that some of its members had not supported the government during the war. Citing State v. Kight, 106 Minn. 371, 119 N. W. 56, and Town of Wells v. Sullivan, 119 Minn. 389, 138 N. W. 305, defendants contend that the court erred in permitting these answers to be given. The witness' reason for unfriendliness to the league was first inquired into on cross-examination. Having gone into the subject, defendants were not in a position to object to its further development by the state within reasonable limits. Mix v. Ege, 67 Minn. 116, 69 N. W. 703; Backus v. A. H. Barber & Co. 75 Minn. 262, 77 N. W. 959; Dole v. Wooldredge, 142 Mass. 161, 7 N. E. 832; Greenleaf, Evidence, § 468.

9. The state introduced evidence of a speech made by defendant Townley at Stillwater in February, 1919. The point of the speech was

that a bill then pending in the Minnesota legislature, to prohibit the carrying of the red flag, indicated an excited state of mind on the part of some people, and that the red flag was the emblem of oppressed people and of Russia. At this point the speaker was interrupted and the speech came to an abrupt end. It is difficult to see the relevancy of this, but, conceding that the evidence was not properly admissible, we think this is not alone a sufficient basis for a new trial, for the reason that there was ample competent evidence to warrant the conclusion arrived at by the jury. State v. Crawford, supra.

10. Defendant Townley was not prejudiced by the exclusion of the speeches he offered in evidence. It is not seriously asserted that they differed substantially from those that were put in evidence by the state. On the contrary, in offering them defendants' counsel stated that they were substantially the same as the St. Paul speech made in September, 1917. That speech was in evidence. Knowing what was said in it, the jury knew what was said in the others. It is urged that the other speeches had a bearing on the question of Townley's intent in making those which the state introduced. The intent with which the speeches were made was immaterial. They were admissible only as evidence of acts done in furtherance of the conspiracy, not as evidence of a violation of chapter 463. Even if defendants had been charged with its violation, their intent would have been immaterial. State v. Gilbert, 141 Minn. 263, 169 N. W. 790.

Reliance is placed on a line of English decisions, holding that in a trial for treason the speeches and publications of the accused showing his loyalty are competent evidence. It is, therefore, asserted that the court erred in excluding Townley's other speeches. A sufficient answer to this is that he was not on trial for treason or sedition.

11. Defendants attempted to prove the authorship of the pamphlet already referred to. Gilbert admitted that he prepared the war resolutions with the exception of one paragraph. Townley did not write any portion of the pamphlet. As we have already pointed out, both defendants authorized or were cognizant of the circulation of the pamphlet. Its circulation, rather than its authorship, was the overt act for which they were responsible, hence the fact that it was largely written by someone else was immaterial.

12. Numerous assignments of error charge the court and counsel for the state with misconduct of so grave a nature as to entitle defendants to a new trial. There were frequent clashes between counsel. As the trial proceeded they became more frequent. Bitterness of feeling was displayed on both sides. At times language was used more appropriate in the arena of political debate than in a court of justice. The trial court was not always successful in promptly stopping the encounters between counsel. We do not attempt to apportion the blame. Doubtless there was provocation on both sides. The incidents of which complaint is made were regrettable. The trial court was of the opinion that they were provoked by defendants' counsel and censured them repeatedly. While we cannot know what effect these incidents had on the jury, it has been our experience that, if the accused and his counsel are treated unfairly by the court or by opposing counsel throughout the trial, the jury is quick to perceive and resent it. The impression we get from the record is that the jury would be apt to conclude that both sides indulged in passages of arms over matters quite foreign to the issues to be determined. Viewed from any standpoint, we do not attach enough importance to the incidents complained of to hold that we are justified in disregarding the conclusion of the trial court that they were not so prejudicial as to entitle defendants to a new trial.

13. Complaint is made of the court's failure to give defendants' requested instructions to the jury. They were not handed to the court until after the county attorney had nearly concluded his argument to the jury. Several days before, the attorneys had been asked to present in advance any requests they intended to make so the court would have time to consider them. The court states that it did not have sufficient time to examine the requests. The statute provides:

"Before the argument begins either party may submit to the court written instructions to the jury * * * and the court, in its discretion, may hear arguments before acting on such requests." Section 7802, G. S. 1913.

The statute relates to the trial of civil actions, but we think it is applicable to criminal actions as well, and that the trial court is not bound to receive or consider requested instructions not presented until after the argument to the jury begins. Especially should this be the rule

where the court has asked counsel to present them seasonably in order that there may be time to consider them. We are aware of the fact that there is a great diversity of judicial opinion on the subject. The rule we adopt is sanctioned by McFadden v. U. S. 165 Fed. 51, 91 C. C. A. 89; State v. Littman, 86 N. J. Law, 453, 92 Atl. 580; State v. Claudius, 164 N. C. 521, 80 S. E. 261; and State v. Glenn, 88 S. C. 162, 70 S. E. 453. It has already been announced as applicable in the trial of civil actions in this state. Gracz v. Anderson, 104 Minn. 476, 116 N. W. 1116. Of course it does not apply where the court is requested to instruct the jury upon a material feature of the case not covered in the charge as given. State v. Zempel, 103 Minn. 428, 115 N. W. 275; State v. Sailor, 130 Minn. 84, 153 N. W. 271.

14. After both sides rested, counsel for defendants made the following statement to the court:

"All of the attorneys of record * * * for defendant Townley * * * withdraw from this case and terminate their employment in this case as attorneys for defendant Townley and * * * continuing to represent defendant Gilbert * * * request the court * * * to indicate whether the court will permit one of us to address the jury solely as attorney for defendant Gilbert."

The court ruled that each side would be allowed to make but one argument. When the county attorney had finished his address, the defendant Townley said:

"I am advised that * * * I may dispense with the services of my attorneys and handle my own case. I have done that and I now ask the permission of the court to address the jury in my own behalf, not in any measure representing Mr. Gilbert."

The state objected. Defendants' attorneys announced that they waived their right to address the jury in Gilbert's behalf. The court denied Townley's request. Defendants' counsel then said: "Mr. Gilbert forbids me to argue the case under the circumstances for him." The result was that the case went to the jury without argument in behalf of either defendant. The denial of Townley's request is assigned as error. Two questions are involved: (1) The right of the defendant in a criminal action to make an unsworn statement to the court and jury. (2) His right to make the argument to the jury in his own behalf in a case

where he is represented by counsel who have conducted his defense up to that point.

As to the first, it was the common law rule, at least in capital cases, that the accused was entitled to make an unsworn statement to the jury at the close of the case. 1 Wharton, Crim. Ev. § 427; 3 Wharton, Crim. Proc. § 1515; 5 Minn. Law Rev. 390. The right, according to some of the English decisions, was not absolute, if the accused was defended by counsel. 1 Wharton, Crim. Ev. § 427; Archbold, Crim. Prac. 196. In some American states there are, or have been, statutes giving the accused this right. Higginbotham v. State, 19 Fla. 557; Blackburn v. State, 71 Ala. 319, 46 Am. Rep. 323; Walker v. State, 116 Ga. 537, 42 S. E. 787, 67 L.R.A. 426; People v. Thomas, 9 Mich. 314. The practice originated because, until recently, the accused was not a competent witness in his own behalf. Since he may now testify, if he wishes to do so, there is no longer any reason why he should be permitted to enjoy a privilege which enabled him to tell his story to the jury without being sworn or submitting to cross-examination. Commonwealth v. McConnell, 162 Mass. 499, 39 N. E. 107. We, therefore, hold that the accused has no right to make an unsworn statement to the jury.

With reference to the second question, we find no constitutional provision which confers on the accused an absolute right to make the argument to the jury in his own behalf. Attention is called to section 6, art. 1, Minn. Const., but that section merely declares that the accused is entitled to have the assistance of counsel in his defense. Section 4947, G. S. 1913, relating to the practice of law, recognizes the right of a party to appear in his own behalf in courts of record. That right undoubtedly exists independently of the statute. The assistance of counsel cannot be imposed on the accused against his will. 8 R. C. L. 83. But, if he elects to be represented by counsel, he waives his right to be heard himself according to some of the English cases. Reg. v. Rider, 8 Car. & P. 539; The Queen v. Manzano, 2 Fost. & F. 64; Reg. v. Beard, 8 Car. & P. 142. In the first of these cases the court remarked that a prisoner defended by counsel should be entirely in the hands of his counsel, that, if he stated as a fact anything which could not be proved by evidence, the jury should dismiss it from their minds, and, if he merely commented on what was already in evidence, his counsel could do it better

than he could. Other English cases hold to the contrary. See 3 Wharton Crim. Proc. 1515; Archbold, Crim. Prac. 197.

Commonwealth v. McConnell, supra, is the only American case cited to sustain defendants' contention. We are not inclined to follow it under the special facts of this case. Both defendants were represented by three experienced attorneys, who had entire charge of the defense until the time came to make the argument to the jury. At this point Townley ostensibly discharged all of them. We say "ostensibly," because it can hardly be claimed that there was a bona fide termination of their employment. After the verdict was returned the same attorneys again appeared for both defendants, moved for a new trial, had a case settled and allowed, took this appeal and appeared in this court and argued the case for them. At the oral argument we understood counsel to say that their alleged discharge was entered of record, solely to avoid the question that would arise if Townley asked leave to argue his own case while still represented by counsel. Since their discharge was only colorable, we hold that it was within the discretion of the trial court to grant or refuse Townley's request. In the exercise of its discretion, the court might properly take into consideration the fact that a party who has not testified is almost certain, in the guise of argument, to make assertions of fact favorable to his cause, which may properly be made only from the witness stand. It might also consider the circumstances under which the pretended discharge of counsel took place, which indicated an attempt by Townley to gain by subterfuge an opportunity to become at once a witness for himself and his own advocate.

15. Defendants insist that they have not had a fair trial, for the reasons already discussed and for others which we deem of too little merit to justify the further extension of this opinion. They were tried in an agricultural county, presumably by a jury composed in part of farmers. Their speeches had been principally addressed to farmers. Their printed matter was circulated among them. When the jury was impanelled, they announced that they were satisfied with its membership. Their counsel was diligent and earnest in their defense.

It is our conclusion, after a thorough examination of the record, that their guilt was clearly established and that none of the errors of law of which they complain resulted in their being deprived of any of their

substantial rights. Their conviction is, therefore, sustained and the order denying a new trial affirmed.