STATE v. HAVEN LARSON.[1]

May 17, 1940.

No. 32,394.

*Douglas P. Hunt*, for appellant.

*J. A. A. Burnquist*, Attorney General, *M. Tedd Evans*, Assistant Attorney General, and *C. A. Rolloff*, County Attorney, for the State.

STONE, JUSTICE.

Convicted of manslaughter in the second degree, his motion for new trial denied, defendant appeals.

On the afternoon of Saturday, March 25, 1939, a group of young men, its personnel changing from time to time, began an itinerant and prolonged spree which ended late Sunday night in the death of Harry O'Toole, who had been employed as a tool checker in the "Watson Camp" of the Works Progress Administration. Late Sunday, defendant, Henry Larson (no relation of defendant), William Ginley, and the deceased, in an automobile driven by defendant, left Montevideo for the "Watson Camp," some eight miles away. Defendant had Ginley in the front seat with him. O'Toole and Henry Larson occupied the rear seat. Somewhere on the way a closed pocketknife was thrown by someone into or across the front seat. Defendant accused O'Toole of doing the throwing. O'Toole denied it. Neither Ginley nor Henry

[1]Reported in 292 N. W. 107.

Larson could testify that O'Toole did it. They drove on to the camp, where Ginley remained. That camp was close to the Minnesota River and on the east bank, only some 800 feet downstream from a new concrete bridge and dam.

The other three men then returned to that bridge and drove to the west end, where, according to the testimony, defendant stopped the car and said to O'Toole, "Well, come on, we will settle it." Both thereupon got out, leaving Henry Larson in the closed car. All he knows of what followed is that he heard some loud talk, including the words, "You son of a gun." Who uttered them he did not testify. He estimates that defendant returned to the car in 15 or 20 minutes. As defendant resumed the wheel, he told Henry, "I got to go back and show the night watchman the knife." He also said then that O'Toole had gone to the "Churchill Place," a tavern on the east side of the river near the camp. They drove on over the bridge and a short distance westward, where there was room to turn around. They did so and went back to the camp. There they found the night watchman, whom defendant told of a fight with O'Toole. Upon being asked where O'Toole was, defendant answered that he was on the bridge drunk. As they were driving over the bridge the last time, Henry Larson did not see O'Toole. Nor did anybody ever see him again alive. May 2, 1939, his body was discovered in the river, some 400 feet downstream from the bridge.

There was an autopsy, which disclosed no evidence of violence other than a contused spot on the left temple, just forward of the ear. The physicians who performed the autopsy testified that the blow which caused that contusion was not the cause of death, and that at most it probably was sufficient to result in unconsciousness. The autopsy produced no evidence to show the cause of death, so it did not disclose that it was due either to drowning or to any other stated cause.

The spillway is directly under the bridge. On the night in question the water was high and running over the spillway in powerful volume. Immediately at the east end of the bridge, extending down from the highway on its downstream side, is an

inclined bank, with a 45-degree slope. At the top, along the driveway, there was no guardrail. At the bottom it ends on top of a vertical retaining wall. Perpendicular to that wall and extending downstream is the inclined slope of the riverbank, roughly riprapped for some distance away from the wall. At the time in question the water was well up on the wall and rip-rapping.

It is the theory of the state, so pleaded in the information and so argued at the trial and here, that defendant assaulted O'Toole and threw him from the bridge into the torrent below. The hypothesis of guilt is based upon a foundation of circumstance which also supports the postulate of innocence. For example, the contusion on O'Toole's temple was as probably caused, it is well argued, by falling on the sharply edged rocks of the riprapping, or by an obstacle in the river, as by any blow inflicted by defendant.

O'Toole was in an advanced state of intoxication. He had reached and passed the maudlin stage. Both the Larsons may have had greater ability to carry liquor. But Henry's testimony is vague and unsatisfactory at several points. Defendant, as was his privilege, did not take the witness stand.

The guardrail of the bridge was four and one-half feet high. On the record it is easily possible that, whatever altercation occurred, O'Toole was left on the bridge alive, but very drunk; and that starting for the camp where he was employed he turned off the bridge at the east end, when, instead of getting onto the steps leading down from the highway, he turned onto the inclined slope and, in his drunken condition, went over the retaining wall into the river. It is also possible that, in similar fashion, he went off the west end of the bridge instead of the east.

Defendant, on the evening of O'Toole's disappearance and later when he was apprehended, made some seemingly contradictory statements, but all of them are susceptible of explanation on the hypothesis of innocence. He was employed in the neighborhood, made no effort to escape, and nothing in his demeanor after

O'Toole's disappearance indicated a sense of guilt or impending danger.

What happened is left by the evidence in the realm of conjecture rather than in that of the sort of inference needed to exclude reasonable doubt. See 26 Am. Jur., Homicide, § 456. Therefore, we take the responsibility for saying that the interests of justice require a new trial.

Order reversed.