## STATE v. ARTHUR DeZELER.[1]

January 13, 1950.

No. 34,833.

[1]Reported in 41 N. W. (2d) 313.

*Allen L. Gray, Milton Gray,* and *John E. Daubney,* for appellant.

*J. A. A. Burnquist,* Attorney General, *Ralph A. Stone,* Assistant Attorney General, *James F. Lynch,* County Attorney, and *Richard B. Ryan,* Assistant County Attorney, for the State.

MATSON, JUSTICE.

Defendant, convicted of murder in the first degree of his wife, Grace DeZeler, appeals from an order denying his motion for a new trial.

Aside from the question whether the evidence sustains beyond a reasonable doubt the verdict of the jury, this appeal presents issues based on alleged prejudicial error in:

### A.

*The admission in evidence of:*

1. The death certificate in its entirety without any qualification or restriction as to its use.

2. Certain pictures of decedent's body.

3–3a. Pretrial statements taken from one of defendant's alibi witnesses.

4. Testimony of an experiment conducted out of the presence of the jury to show that decedent's body could have been transported in the trunk of defendant's car and also testimony as to the reasonable driving time between the locus of the crime and the place where the body was found.

## B.

*The denial to defendant of:*

5. A polling of the jurors to determine whether they had read certain newspaper articles.

6. A polling of the jury to ascertain if a third party had discussed the trial with a member of the jury.

7–7a. His alleged right to examine his murdered wife's physician.

Grace DeZeler, defendant's wife, was last seen alive in her home about 12:05 a. m. Saturday, September 20, 1947. She and defendant, together with Grace's two children by a prior marriage, Sonny Pfeiffer, aged 14, and Charlene Pfeiffer, aged 16, lived in a basement dwelling in rural Ramsey county. Their marriage, since its inception in 1941, apparently ran a normal course until about five months prior to September 1947, when domestic trouble began. Thereafter they rarely went out together, and defendant began to have affairs with other women, including his former wife, Elizabeth DeZeler. August 1, defendant, in whose sole name the basement home was held, advertised it for sale. The family rift grew steadily worse, and by September 17 a breakup of the marriage was imminent. Grace—sometimes herein called the decedent—sought to rent a cottage for herself and the children. She employed an attorney to commence divorce proceedings and had an appointment to sign the necessary papers at his office on September 22 or 23.

On the evening of September 19, decedent, with Sonny, drove in her car to a neighbor's house where her daughter, Charlene, was temporarily staying. She there left a note for Charlene reading: "See you tomorrow. * * * Mother." She then left Sonny at a downtown movie, and, after so doing, went to a tavern on Payne avenue, where she arrived around 8 p.m. She spent little time inside the tavern, but for the most part, until shortly after 11 p.m., sat outside in her car talking to friends. About 10:30 p.m. she had a light lunch. When Sonny, about 11:45 p.m., came home from the picture show, he found his mother at home alone and in bed covered with a sheet. It is not known how she was dressed for bed, but it appears to have been her custom to retire clad only in panties. Sonny, after

turning on the light, sat down on his mother's bed, and they talked for a few minutes about the show he had seen. Afterward he ate something. At about 12:05 a. m., he went to bed and almost immediately fell asleep. There was evidence that normally he was an unusually sound sleeper. His bed was located in a small room made by wallboard partitions with only a drape for a door. Sonny heard nothing during the night. When he awakened about 7:40 a.m., his mother was not in the house, but the blankets were carefully placed over her bed. Observing that the bed appeared to be lower than usual, he investigated and found that the mattress, pillow, and bed sheets were missing. Some of his mother's clothes, including certain dresses, shoes, and her purse were also gone. Her car was still standing in the yard. Sonny's stepfather, the defendant, was not at home, and his boat and trailer were missing from the usual parking place in the yard. It was not until between 1:30 and 2 p.m. on this day, September 20, that defendant appeared at the home. He left almost immediately without any trailer attached to his car, but shortly thereafter, about 2 p.m., he arrived at a neighbor's place with the boat and trailer to be left for storage. Defendant, with the use of a box trailer, then made several trips to move certain belongings from the basement home. He took the family washing machine to the home of his former wife, Elizabeth. The following day, Sunday, he continued to pack and take other household appliances to Elizabeth's home. Thereafter, he stayed with Elizabeth until the time of his arrest on October 14. On September 23, he sold the basement dwelling furniture in exchange for an oil stove for Elizabeth's home. About the same time he tried to sell decedent's car.

Grace DeZeler was not seen alive after Sonny Pfeiffer had talked to her near the midnight hour of September 19. Her body, clad only in panties, was discovered October 14, 1947, in Little Bass Lake in Crow Wing county, about 165 miles from St. Paul and about 28 miles from Brainerd. The body was floating, although a concrete block was attached to it by a wire. An autopsy, performed in Ramsey county, disclosed that decedent had died before entering the

water as the result of a fractured skull. An examination of the stomach disclosed, among other things, the presence of peas. The body had been in the water for about three weeks. Also discovered at the lake were burned remnants of clothing identified as belonging to decedent, remnants of paper slips bearing her name and that of her employer, as well as remnants of a pillow and pillow slip similar to those used by decedent. The pillow had human blood on it. In the basement home, several spots of blood were also discovered on the wallboard paneling near the head of the bed in which she had slept on the night of September 19. Human blood was also found on a wrench in the trunk of defendant's car. (For other significant evidentiary facts, see subdivision 8 of this opinion, *infra*.)

Before proceeding to a further consideration of the evidence to ascertain whether the jury's verdict is sustained beyond a reasonable doubt, we shall first consider the issues arising out of alleged procedural errors.

■ Although no reference had been made to the death certificate during the direct examination of the coroner of Crow Wing county, a physician, defendant upon cross-examination raised the issue as to whether such certificate had been properly executed. Defendant asked if the coroner had consulted the county attorney with reference to his duties, if he was familiar with the laws relating thereto, and then, quoting from M. S. A. 390.23, asked if he was familiar with the provision, which reads:

"It shall be unlawful for any person, other than the coroner, to issue a certificate of death in any of the following cases: Violent or mysterious deaths, including suspected homicides, occurring in his county, * * *."

The coroner frankly admitted that he could not say he was familiar with all the details of the law governing coroners and admitted that he had never read the statutory provision above quoted. Defendant then asked if the coroner had signed the death certificate, and he received an answer in the affirmative. Upon redirect examination, the state offered the death certificate in evidence, and it was received, although defendant objected that it was inadmissible.

We have held that the statutory provision (§ 144.167) that death certificates "shall be prima facie evidence of the facts therein stated" does not apply to conclusions and inferences found therein which were drawn by the certificate maker as to whether the death was suicidal, or, in other words, that it does not apply to conclusions or inferences as to the identity of the individual who caused the death. Backstrom v. New York L. Ins. Co. 183 Minn. 384, 236 N. W. 708. If we assume, *solely for the purpose of discussion,* that the prima-facie-evidence rule of § 144.167 has no application to any and all conclusions and inferences found in the death certificate and which are not based on the certificate maker's knowledge as a medical expert, was the death certificate in the instant case admissible? Did defendant by his cross-examination open the door to its admission when it would otherwise have been inadmissible? Defendant's cross-examination, by implication and otherwise, cast doubt upon the qualifications of the coroner by making a substantial issue of the proper execution of the death certificate. The state had the right upon redirect examination to introduce the death certificate to rehabilitate the witness as to his qualifications and proper conduct. Where one party introduces inadmissible evidence, he cannot complain if the court permits his opponent in rebuttal to introduce similar inadmissible evidence.[2] Defendant contends, however, that the rebuttal should have been limited to the execution of the death certificate, and that for this purpose the contents of the certificate should not have been made available to the jury. It is to be noted that defendant's objection was directed to the certificate as a whole and was not accompanied by any request for special provision for withholding or restricting the use of the contents. The court in its discretion admitted the entire certificate, and we find no prejudicial error. The certificate did not contain any statements purporting to identify defendant as the

---

[2]Wright v. Engelbert, 193 Minn. 509, 259 N. W. 75; Prevey v. Watzke, 182 Minn. 332, 234 N. W. 470; Mooney v. Burgess, 142 Minn. 406, 162 N. W. 308; 1 Dunnell, Dig. & Supp. §§ 7193, 7202; see, 1 Wigmore, Evidence (3 ed.) §§ 15 to 18; 3 Am. Jur., Appeal and Error, § 879; 31 C. J. S., Evidence, §§ 190, 191.

murderer. It indicated that the date of death was unknown, but it contained a notation reading in part as follows:

"\* \* \* Autopsy showed cause of death to be fractured skull, presumably by blunt instrument and state of decomposition of body indicated immersion estimated at 2-3 wks. From evidence obtained from Ramsey Co. Sheriff's office—conclusion made that death occurred in Ramsey County."

The immediate cause of death and the time thereof were established by other competent and, in fact, practically unchallenged evidence. Insofar as Ramsey county was fixed as the place of death, no prejudice resulted. The statement that the death occurred in Ramsey county by no means cast doubt upon a theory that the homicide might have been committed by some person other than defendant, and it did not purport to identify defendant as the murderer. Assuming that the contents of the death certificate were inadmissible, its admission was error without prejudice. See, 1 Dunnell, Dig. & Supp. § 416.

2. There is no merit in defendant's contention that certain photographs showing the horrible condition of decedent's body at the time of its discovery and (as disclosed by the autopsy) the ghastly nature and location of the death-producing wound should have been excluded because they might possibly arouse passion or prejudice with the jury. There is no indication that they were distorted or that they did not convey an accurate representation of the subject matter. They were relevant to material issues, namely, to show the nature and location of the death wound, that death had occurred some weeks before the body was found, and to indicate how a certain 42-pound concrete block and a piece of wire were attached to the body to effect its concealment. The block and wire were relevant links in the chain of evidence. The horrible, revolting, and ghastly condition of the corpse, as depicted by the photographs, was an inherent and inseparable part of the facts which were relevant to a full consideration of material issues by the jury. Photographs are admissible as competent evidence where they *accurately* portray anything which it is competent for a wit-

ness to describe in words, or where they are helpful as an aid to a verbal description of objects and conditions, provided they are relevant to some material issue; and they are not rendered inadmissible merely because they vividly bring to jurors the details of a shocking crime or incidentally tend to arouse passion or prejudice. This is the general rule, and any other would be an anachronism in this day when pictures are a common and recognized medium for the accurate portrayal of objects and events.

"A photograph, like a map or diagram, is a witness' pictured expression of the data observed by him and therein communicated to the tribunal more accurately than by words. Its use for this purpose is sanctioned beyond question." 3 Wigmore, Evidence (3 ed.) § 792.[3]

▮▮▮ Defendant's witness and former wife, Elizabeth DeZeler, after having been cross-examined as to inconsistencies between her testimony and the answers given by her in connection with certain pretrial statements, said in explanation thereof upon redirect examination that the pretrial questioners had tried to confuse her. Upon recross-examination, she emphasized that *all* pretrial questions were confusing and were designed to confuse her. Over the objections of defendant, complete copies of these statements were received in evidence. Defendant asserts that prejudicial error resulted—involving a violation of his constitutional rights—in that the statements contained references to defendant's refusal to take a lie detector test and truth serum, and that these references should have been withheld from the jury. After having first laid a proper foundation, as was here done, the prosecution had the right on recross-examination to discredit and rebut the explanation given by the witness for the inconsistency between her testimony and her pretrial answers. See, 6 Dunnell, Dig. & Supp. § 10351; 58 Am. Jur., Witnesses, § 767. Ordinarily a pretrial statement offered in evidence

[3]See, Potts v. People, 114 Colo. 253, 158 P. (2d) 739, 159 A. L. R. 1410; State v. Fine, 110 N. J. L. 67, 164 A. 433; Hawkins v. State, 219 Ind. 116, 37 N. E. (2d) 79; Commonwealth v. Sydlosky, 305 Pa. 406, 158 A. 154; 2 Dunnell, Dig. & Supp. § 3260; Annotation, 159 A. L. R. 1413.

for an impeachment purpose should be received only to the extent reasonably necessary to accomplish that purpose, and when it incidentally contains matter which may be prejudicial if considered for any other purpose, which prejudicial matter cannot in a practical manner be separated from the statement as a whole and excluded, *the jurors should be cautioned to disregard such prejudicial matter for all purposes except that of impeachment.* Here, Elizabeth's contention that she had been deliberately asked confusing questions was sweeping in scope and related to *all* pretrial statements in their entirety, and, in order to effect her impeachment, it was not practical to withhold certain portions, even though they related to matter that was otherwise of a prejudicial nature. Defendant did not request that the jury be given a cautionary instruction to give no weight or consideration to the references to lie detector tests and truth serum, except insofar as such references were relevant to the purpose of impeachment. Defendant should not now be heard to complain. State v. Soltau, 212 Minn. 20, 2 N. W. (2d) 155; 2 Dunnell, Dig. & Supp. § 3237a. Where certain evidence is admissible only for the limited purpose of impeachment, it is not prejudicial error for the trial court in admitting the evidence for that purpose to fail to give the jury, in the absence of a request therefor, a cautionary instruction that no weight or consideration shall be given such evidence for any other purpose.[4]

---

[4]State v. Schomaker, 149 Minn. 141, 182 N. W. 957; Tri-State Transfer Co. v. Nowotny, 198 Minn. 537, 270 N. W. 684; People v. Hale, 81 Cal. App. 734, 254 P. 639; Pueblo Elec. St. Ry. Co. v. Sherman, 25 Colo. 114, 53 P. 322, 71 A. S. R. 116; People v. Bowen, 170 Mich. 129, 135 N. W. 824; Southern Kansas Ry. Co. v. Painter, 53 Kan. 414, 36 P. 731; Commonwealth v. Saldutte, 136 Pa. Super. 52, 7 A. (2d) 121; People v. Smith, 134 Cal. 453, 66 P. 669; 2 Dunnell, Dig. & Supp. § 3237a. Cf. State v. Schomaker, *supra,* where it was held that an entire pretrial statement, if it contains prejudicial matter, may not be admitted. In the Schomaker case, however, the entire statement was not necessary for the purpose of impeachment, and no consideration was given to the principle that if there is a reasonable necessity the whole statement may be admitted if accompanied, where requested, by a cautionary instruction as to its limited use.

■ Defendant further predicates error by the trial court in permitting testimony of an experiment conducted out of the presence of the jury. This experiment involved the placing of a deputy sheriff, whose stature was larger than that of decedent, into the trunk of defendant's car for the purpose of showing that defendant could have transported his wife's body therein from the family home in Ramsey county to Little Bass Lake. The performance of experiments in the presence of the jury, or the admission of evidence of experiments performed out of the presence of the jury, when they are made under conditions and circumstances substantially similar to those existing in the case at issue, for the purpose of proving facts in issue, rests in the sound discretion of the trial court in both criminal and civil proceedings. The qualifications of the person or persons conducting a particular type of experiment, as well as the extent of permissible dissimilarity in conditions and circumstances, depend on the facts peculiar to each case.[5] We find no abuse of discretion herein. The experiment, which did not require technical knowledge, was performed under conditions and circumstances substantially similar—though not identical—to those obtaining as to the issue involved. Such dissimilarities as existed were neither material nor misleading.

Analogous to the admission of testimony of the performance of an experiment to determine the driving time between St. Paul and Little Bass Lake, for the purpose of showing that defendant had ample time in which to transport decedent's body to that lake, dispose of it, and then return, was the admission of testimony as to

[5]See, Smith v. St. Paul City Ry. Co. 32 Minn. 1, 18 N. W. 827, 50 Am. R. 550; Thiel v. Kennedy, 82 Minn. 142, 84 N. W. 657; Winters v. M. & St. L. R. Co. 131 Minn. 181, 154 N. W. 964; Huestis v. Aetna L. Ins. Co. 131 Minn. 461, 155 N. W. 643; McAlpine v. Fidelity & Cas. Co. 134 Minn. 192, 158 N. W. 967; State v. Allison, 330 Mo. 773, 51 S. W. (2d) 51, 85 A. L. R. 471; Kohlhagen v. Cardwell, 93 Or. 610, 184 P. 261, 8 A. L. R. 11; 2 Dunnell, Dig. & Supp. §§ 3246, 3261; 20 Am. Jur., Evidence, §§ 257, 755 to 760; 2 Wigmore, Evidence (3 ed.) § 445; 4 Wigmore, Evidence (3 ed.) §§ 1154a, 1160; Annotations, 8 A. L. R. 18 and 85 A. L. R. 479. We have not overlooked dicta found in State v. Ronk, 91 Minn. 419, 98 N. W. 334, which is at variance with later decisions and with the majority rule.

the reasonable driving time of various types of vehicles between either St. Paul and Little Bass Lake or between St. Paul and Brainerd. One of these vehicles was an automobile which made a round trip between St. Paul and said lake. The other vehicles were buses and trucks traveling between St. Paul and Brainerd. We find nothing prejudicial in this testimony. If these various vehicles had made the trips as experimental test runs to determine the reasonable driving time, testimony in regard thereto would have been admissible, in that the performance of these test runs, though not made under conditions and circumstances identical with those obtaining as to the issue involved, were sufficiently similar to be admissible. Such dissimilarities as existed were neither material nor misleading and on the whole were of a nature that would operate in defendant's favor rather than to his prejudice.

■ It was not error to deny defendant's repeated requests that the jury be polled to determine if they had read certain newspaper articles pertaining to the crime and the conduct of the trial. On several occasions the trial court cautioned the jurors not to read the newspapers. Where the jury has been clearly admonished not to read newspaper accounts of the trial, the granting or denial of a defendant's request that the jurors be interrogated during the trial as to whether they have read newspaper accounts or headlines rests in the sound discretion of the trial court. People v. Phillips, 120 Cal. App. 644, 8 P. (2d) 228; 23 C. J. S., Criminal Law, § 1449. When a jury has been clearly admonished not to do a certain act, the mere opportunity to violate that admonition, without a vestige of proof of its violation, provides no basis upon which a court of review can find that the trial court has abused its discretion in refusing to investigate the jury for such possible misconduct. As an essential of a fair and impartial trial, there is no presumption that the jury is likely to take advantage of every opportunity to disregard the cautionary instructions of the court. It is also to be noted that the newspaper articles which were submitted to the trial court as special exhibits were not so inflammatory, distorted, or misleading that the trial court, in the light of its cautionary

instructions, could not have found in the exercise of a sound discretion that a reading thereof by any juror would be nonprejudicial. State v. Soltau, 212 Minn. 20, 2 N. W. (2d) 155; State v. Briggs, 122 Minn. 493, 142 N. W. 823; State v. Williams, 96 Minn. 351, 363, 105 N. W. 265, 270; see, Annotation, 86 A. L. R. 928.

6. Defendant, alleging that he had heard from one newspaperman that another newspaperman named Smalley had discussed the trial with one of the jurors, demanded that the jury be interrogated with respect thereto. The court, in its chambers, was prepared to have defendant call both newspapermen to ascertain whether there was any substance to the report. Defendant was not able to produce his informant, but Smalley was present. Defendant refused to question him, but insisted that the court should conduct an investigation. This the court refused to do, stating that it could not disturb the jury by inquiring of it as to each and every rumor. The lower court's handling of this matter was eminently proper. Whether there has been a communication with the jury and whether it has caused prejudice are fact questions to be determined by the trial court in the exercise of sound discretion. State v. Soltau, 212 Minn. 20, 2 N. W. (2d) 155; State v. Rediker, 214 Minn. 470, 8 N. W. (2d) 527; State v. Warren, 201 Minn. 369, 276 N. W. 655.

 Defendant predicates prejudicial error because of the trial court's denial of his alleged right to examine his murdered wife's physician, where the special administrator of her estate refused to waive the privilege created by M. S. A. 595.02(4), and defendant himself, as his wife's heir, claimed a right of waiver. Whether a defendant may either assert or waive the statutory right of privilege between a physician and his patient with respect to the victim of the crime of which defendant is accused need not be determined, in that the record herein fails to disclose that defendant has been prejudiced.[6] It is significant that both in chambers prior to the making of defendant's opening statement to the jury, and again in

_____

[6]*In re claim to or waiver of privilege by either the defendant or the prosecution* in criminal proceedings, see Annotations, 2 A. L. R. (2d) 645, 647 to 653, and Ann. Cas. 1913E, 884; 58 Am. Jur., Witnesses, § 436.

open court when decedent's physician was on the witness stand and objection had been made to his being permitted to testify, it was called to the attention of defendant that it was desirable to make an offer of proof to the court so that it might know the purpose and the materiality of the testimony. Apparently defendant did not deem the testimony of decedent's physician of any materiality, in that he refused and failed to make such disclosure. An exclusion of evidence, even though it be technically erroneous, is deemed to be without prejudice and to furnish no basis for a reversal unless the record discloses that the purpose and substance of the evidence have in some way, such as by the asking of *permissible* questions or by the making of an *adequate* offer of proof, been made known to the trial court.[7] An accused who refuses to disclose the materiality of his proffered evidence rests his case upon a mere technicality and should not be heard to complain when such evidence is excluded. A criminal conviction will not be reversed for mere technical errors where the accused has not been prejudiced through the impairment of some substantial right essential to a fair trial. State v. Townley, 149 Minn. 5, 182 N. W. 773, 17 A. L. R. 253.

■ Although we have found no prejudicial error in the admission of evidence or in the conduct of the trial, we have yet to consider defendant's contention that the circumstantial evidence upon which the verdict is based does not sustain an inference of guilt beyond a reasonable doubt. Where the facts and circumstances disclosed by circumstantial evidence form a complete chain which, in the light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt, the verdict must stand.[8] In the light of this principle, the verdict is clearly sustained. Beyond the evidentiary facts already given, additional significant evidence was adduced.

[7]National Citizens Bank v. Thro, 110 Minn. 169, 124 N. W. 965; State v. Nelson, 91 Minn. 143, 148, 97 N. W. 652, 654; 3 Am. Jur., Appeal and Error, § 1005; Model Code of Evidence, Rule 7.

[8]See, State v. Larson, 207 Minn. 515, 292 N. W. 107; 20 Am. Jur., Evidence, § 1217; 26 Am. Jur., Homicide, § 456; 2 Dunnell, Dig. & Supp. § 2455.

About 7:30 p.m. on September 19, 1947, when defendant left his home for the evening, he told decedent to be home early because he wanted to give her some money. After a football game, he went to call on a girl friend, whom he took riding and with whom he stayed until sometime between 11:45 p.m. and 12 midnight. In the course of the evening, he told this girl, in driving past his home and in focusing the car lights thereon, that he wanted to find out if his wife had stayed home as she had been told to do. He said that he was in a hurry, because he had to go to Brainerd. He said he had work to do and that he wanted to get started about 12 o'clock. After taking this girl home, he was followed by her fiancé in another car until he was lost sight of around 12:30. The jury could reasonably find that defendant later proceeded to his home and entered quietly—without disturbing decedent's 14-year-old son, who was a very sound sleeper—and killed his sleeping wife by striking her over the head with a wrench, placed her body in the trunk of his car, and that he then removed the blood-splattered sheets, pillow, and mattress, together with some of his wife's clothes, to make it appear as if she herself had dressed and departed. It could be reasonably found that he used not only his car but his boat and trailer in transporting his incriminating load from the premises to Little Bass Lake on the other side of Brainerd, where he weighted the body with a concrete block and dumped it into the lake.

It could reasonably find that he then burned the pillow, pillow slip, and certain articles of his wife's wearing apparel near the lake, and that he returned home by noon of the next day. The evidence shows that there was ample time for him to make the trip and to return. The only reasonable inference is that the crime was committed by a person thoroughly familiar with the home premises, the sound sleeping habits of decedent's son, and with Little Bass Lake. This inference points directly toward defendant and no one else. In the trunk of his car was found a wrench spotted with human blood, as if it might have been used in striking a human being. Human blood spots were found on the wall paneling next to the bed where decedent slept. The concrete block attached to her

body was identified, by reason of a certain manufacturing defect, as having come from the same lot of building blocks as those used in the construction of the basement home. Likewise, the wire used in attaching the concrete block to decedent's body was of the same kind as that found and used about the family home. It is also significant that defendant's relations with his wife had become quite antagonistic and that a divorce was in the offing. Decedent wanted alimony, although this was apparently contrary to the agreement at the time of the marriage to "break clean" if the marriage ever terminated. It is also to be noted that defendant's relationships with his former wife and, in addition, with a young woman friend were becoming highly complicated. Under the circumstances, it is a reasonable inference that defendant, whatever his motive may have been, believed that the simplest way out of his difficulties was to do away with his present wife and return to his former wife, Elizabeth.

It is true that defendant's personal story of his whereabouts on the night in question was corroborated by his former wife, Elizabeth. They both testified that on Saturday morning he had taken Elizabeth to work and that he had had breakfast with her in a coffee shop. It is unnecessary to review this testimony in detail. His former wife's testimony of corroboration was largely destroyed by other evidence and by her own prior inconsistent statements. The jury could reasonably reject her testimony, as well as that of defendant, as untrue. Defendant unjustifiably makes much of the fact that the autopsy diclosed undigested peas in decedent's stomach, and of the fact that food is usually passed out of the stomach of *normal* individuals in three to four and one-half hours. Defendant introduced testimony to the effect that no one saw decedent eat any peas subsequent to her evening meal and that therefore she must have eaten them after the time when she disappeared from the family home. There is nothing, however, to preclude the supposition that decedent might have eaten the peas right in her home shortly before she went to bed. Furthermore, according to the testimony of Dr. King, the estimate of three to four and one-half

hours related strictly to a *normal* individual. He carefully pointed out that many factors, such as the nature of the food eaten, an upset emotional state, and a variety of functional disturbances, could very materially slow down the time in which the stomach empties itself through peristaltic action. In certain cases he said the peristaltic action might even be inhibited completely for some time through physical shock. There was no controlling evidence to exclude the possibility, or even the likelihood, that decedent was not upset emotionally or that she might not be subject to certain undetermined functional disturbances.

In the light of the evidence as a whole, the jury was fully justified in finding defendant guilty, beyond a reasonable doubt, of the first-degree murder of his wife, Grace DeZeler.

Affirmed.

