**STATE of Minnesota, Respondent,**

v.

**Sherman Bothne GIBBONS, Appellant.**

**No. 50722.**

Supreme Court of Minnesota.

May 8, 1981.

Rehearing Denied June 16, 1981.

Rapoport, Singer, Wylde & Nordby and Jack Nordby, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Thomas L. Fabel, Deputy Atty. Gen., and Richard D. Hodsdon, Sp. Asst. Atty. Gen., St. Paul, Stephen C. Rathke, County Atty., Brainerd, for respondent.

YETKA, Justice.

On April 5, 1979, appellant was indicted for second- and third-degree murder in connection with the death of Donald Fleischman three days earlier. On July 10, 1979, the district court issued its omnibus order that permitted the state to introduce evidence of appellant's juvenile conviction and other misconduct. The case was tried to a jury in Duluth on a change of venue from Crow Wing County District Court. The jury returned a verdict of guilty on the charge of second-degree murder. Minn. Stat. § 609.19 (1980). On September 17, 1979, appellant's motion for a new trial was denied and he was sentenced to a term of 1 year and 1 day to 40 years. Appellant is presently serving his sentence at St. Cloud Reformatory. This appeal is from the trial court's denial of appellant's motion for a new trial. We affirm but reduce the conviction to second-degree manslaughter and remand for resentencing.

Because one of the principal issues in this case concerns the sufficiency of the state's evidence as to intent, the facts are set forth in some detail.

Appellant Sherman Gibbons was 18 years of age at the time of the shooting and the victim Donald A. Fleischman was 17 years of age. The two had known each other for several years.

Appellant testified that on the morning of the homicide, he arose at 10:35 a. m. and shortly thereafter received a call from Fleischman who asked him to come over. Appellant drove his mother's car to the Fleischman trailer home located in a rural wooded area about 10 miles north of Brainerd, Minnesota. Arriving at the Fleischman trailer, he parked in the driveway, knocked on the door and started to leave when he got no response. Appellant stopped when he heard a shot fired and saw Donnie Fleischman moving up the road towards him. Donnie had fired the shot to get appellant's attention. The shot was apparently fired from a .38 caliber revolver that belonged to Fleischman's father. A single shot was also heard by Kathleen Maneske, a neighbor of the Fleischmans who was outside hauling wood. Mrs. Maneske testified that the shot she heard occurred approximately 15 minutes after she saw a car arrive at the Fleischman trailer around 11:30 a. m.

Appellant testified that the shot did attract his attention and that he and Donnie then went into the trailer to discuss what to do. Appellant also stated that while he was in the house, Donnie fired two shots just outside the trailer with an unidentified rifle at a board in the backyard he often used for target practice. Crow Wing County Deputy Sheriff Rudquist testified that he interviewed appellant shortly after the fatal shooting and that appellant stated that Donnie had fired a single shot with a .380 caliber pistol in the direction of the backyard. A .380 caliber pistol was later discovered in the trailer, but a search of the area where Donnie had fired the shot or shots did not reveal expended shell casings from either the .380 pistol or a rifle. Appellant explained at trial that he was not certain what kind of weapon Donnie had fired and that he only informed Officer Rudquist that it could have been the .380 pistol.

Greg Hanson and his father Robert Hanson were electricians who were working in a new home near the Fleischman trailer. Both Hansons testified that they arrived at the site shortly after 11:00 a. m. the day of the shooting. The Hansons both heard a shot at approximately 11:30 or 11:45 a. m. and another shot immediately following the first.

Appellant testified that he and Donnie Fleischman left the trailer around noon and visited Jim Giles. They stayed with Giles for a short time, obtained some marijuana and parked in a remote spot to smoke it. Giles could not recall what time the two visited him that morning. They returned to the trailer at approximately 12:30 p. m. and began to throw Donnie's pocket knife at a pile of logs standing next to a wood stove. Appellant testified that Donnie also threw the knife against the paneling of the trailer at least "eight or nine times" and that Donnie was not concerned about the paneling because it was already damaged.

Appellant testified that he and Donnie then began to examine a 35 caliber rifle and a 30.06 caliber rifle that were in a gun case in the trailer. Appellant was attempting to remove the clip from the 35 caliber rifle but was unable to do so because he was unfamiliar with the gun. While appellant was handling the 35 caliber rifle, he was seated on the floor. Appellant stated that Donnie then approached him with the 30.06 rifle and told him to look up. When appellant looked up, Donnie pulled an empty casing out of the gun, threw the casing at appellant and ejected four shells from the 30.06 rifle in the direction of appellant. Appellant's testimony indicates that he threw the empty casing back toward Donnie, collected the four ejected shells and placed them on the floor beside him. Approximately 5 minutes after the live shells were ejected from the 30.06, appellant asked Donnie how the 35 caliber rifle operated and handed him that weapon. Donnie set the 30.06 down and took the 35 caliber rifle to the couch. Appellant then rose, watched Donnie work the action on the 35 caliber rifle, picked up the 30.06 and sat down in a rocking chair across the room from where Donnie was working with the 35 caliber rifle. Appellant testified that while holding the 30.06 rifle, he rose from the rocking chair and the rifle discharged. Appellant stated he dropped the rifle and then saw that Donnie had been hurt. Appellant went directly to the phone, talked to the operator who connected him with the ambulance service, the sheriff's office, and a friend's mother who was a nurse. The police dispatcher testified that he received appellant's call at 1:07 p. m.

The Hansons testified that shortly after 1:00 p. m., appellant found them working in the basement of a neighboring house, asked if they knew first aid and told them Donnie had been shot. When the Hansons and appellant returned to the trailer, a deputy sheriff had arrived and the ambulance and other officers arrived shortly thereafter. Appellant stated that he did not render first aid to Donnie because he believed he would be sick or faint.

Ambulance attendant Steven Brandt testified that when he arrived at approximately 1:15 p. m., the victim's eyes were open and only partially dilated, and that blood flowed from the wound with some rhythm. The other attendant, Jeffrey Birchem, also thought the victim's heart was still beating. Birchem also stated that there was a minimum amount of blood coagulation about the wound area. Both attendants believed that the victim was still alive when they arrived. The ambulance rushed Fleischman to the hospital, but he was pronounced dead at the emergency room.

Pathologist Richard Rottschafer testified that the death was caused by blood loss from massive injury to the right lung and heart. The injuries were caused by a bullet fragment that passed completely through the body. Numerous bullet and other metal fragments were also removed from the body. A portion of the rear sight of the 35 caliber rifle that Fleischman was holding was found imbedded in his left shoulder. The pathologist also testified that the victim's arm had been raised to the point where the bicep was level with his shoulder at the time of the impact.

There was testimony from the pathologist to the effect that the victim could have survived for as long as a couple of hours after receiving the injuries that Fleischman had. A defense pathologist testified, after examining photographs and the autopsy protocol, that an individual with wounds such as those received by the victim could live only for a maximum period of 15 minutes.

The officers who were first on the scene, the Hansons, and the ambulance attendants disturbed the exact position of the firearms and furniture in the room where the shooting occurred. Appellant was also allowed to look about the room for a clip to the 30.06 rifle that he eventually located. The 30.06 rifle that fired the fatal bullet was found with one spent shell in the chamber and two live rounds in the clip that held a maximum of four. The 35 caliber rifle was found fully loaded and the .38 was found loaded with one spent shell. Four live 30.06 cartridges were found on the floor. A spent 30.06 shell was found in front of the couch where the victim was found. A spent 30.30 cartridge and a spent .22 cartridge were also found in the room.

There was fresh puncture damage to a piece of paneling on the wall and the victim's pocketknife was found with its tip broken off. Behind the couch, the interior window was broken in three places and blood-splattered, and the exterior window was broken in one place. No bullets were found outside, but a small maple tree was damaged. The prosecution recreated its theory of the positions of appellant and Fleischman and the path of the bullet or bullets fired at Fleischman. An expert from the State Bureau of Criminal Apprehension testified as to where Fleischman was positioned based on a blood-spatter analysis of the window behind the couch. A surveyor was also called by the state to testify as to the trajectory of the bullet fragment found imbedded in a tree outside the trailer window. The state's reconstruction indicated that Fleischman was on or near the couch and that appellant was on or near a rocking chair opposite him. The state's evidence also indicated that the fatal bullet traveled from the gun held by appellant, struck the sight of the gun held by Fleischman at a 5°–10° angle where it shattered, deflected, struck Fleischman, passed through him and broke the window. The damage to the 35 caliber rifle and the angle at which the 30.06 bullet struck that weapon suggests that the two rifles were pointed approximately at each other. Mr. James Lansing of the Bureau of Criminal Apprehension testified that all the damage could have been caused by one bullet.

The state was allowed to introduce evidence of appellant's prior juvenile convictions and other misconduct in order to prove motive, intent, or lack of accident or mistake.

While a juvenile, appellant left school after the tenth grade, worked intermittently at Haberman's Resort near Brainerd and spent leisure time with his friends at the resort. Appellant's group of friends included Donnie Fleischman, Steven Lanz, Duane Stettler, Annette Haberman and appellant's brother Rusty, who was also a friend of Fleischman's. In late 1978, Fleischman and Steven Lanz began burglarizing cabins and appellant later joined in this activity. When Lanz and Fleischman were seen stealing wood, they left Brainerd for Mankato and appellant and Duane Stettler joined them there. When appellant reached Mankato, he learned that the Brainerd police were looking for the trio who committed the burglaries. Appellant also learned that Lanz and Fleischman were going to turn themselves in and he opposed this. Stettler, appellant, Lanz and Fleischman were parked at a restaurant in Mankato when Lanz and Fleischman kidded appellant that they would blame the burglaries on him on their return. Appellant pointed a .410 shotgun at Fleischman and Lanz and Lanz pulled a knife and put it to appellant's throat. Duane Stettler testified that the incident was not serious, but just horseplay. Lanz, appellant and Fleischman did return to Brainerd and turned themselves in after the Mankato incident. Appellant and Fleischman were treated as juveniles and placed on probation, but Lanz went to jail as an adult.

Lanz was allowed to testify that in November 1978 appellant had pointed a loaded .30.06 at Fleischman and in the same month had pointed an unloaded rifle at a woman and pulled the trigger. When asked if Donald Fleischman had expressed his concern about appellant's behavior, Lanz said that he had on two occasions.

On cross-examination Lanz admitted that he had been a drug user for 2½ to 3 years, that he was in drug treatment, and that he had some "memory problems." He admitted that he hated appellant, that he had a fight with him in December, that he had threatened to kill him, that he would still like to kill him, that he had pointed loaded guns at appellant 20–25 times, that he had gone to the police to implicate appellant after Fleischman's death and that he wanted to testify against appellant. Lanz admitted that he had the stolen shotgun to use against the police if he were caught for the burglaries while in Mankato. He also said it was "kind of a common practice" for him, Fleischman, and appellant to point guns at one another "pretty regular."

Stettler also testified that about a week before the shooting, appellant had shot Fleischman with a BB gun at Fleischman's house and that the two had played "chicken" with guns and talked of "blowing" each other "away."

On cross-examination, Stettler admitted this was horseplay and a "common" and "ordinary" thing among this group of friends. He also testified that they pointed loaded guns at each other regularly and that he never saw appellant do anything that was actually dangerous to Fleischman. Stettler stated he never saw a serious problem between them.

Donald Fleischman, Sr., testified that about a week before the April 2, 1979 shooting, a window had been shot out of his pick-up truck and that he later noticed a camper and snowmobile were damaged. As a result of this, he asked appellant to leave their house and not return. Michael Bancroft testified that on the Friday before the shooting, he and appellant were shooting BB guns outside Fleischman's house and that one of his (Bancroft's) shots broke the truck window. He said he did not know how the other things were damaged but was permitted to testify, over objection, that appellant "could have" been responsible. He said he told appellant later that the police were looking for him because of this damage. Deputy Dale Wolke testified that he discussed the vandalism with the Fleischmans and Bancroft and attempted unsuccessfully to find appellant to discuss it with him. On cross-examination Wolke admitted Bancroft told him that appellant had not caused the damage.

While in jail after the shooting incident, appellant told a fellow prisoner about the shooting and stated he had been "snitched off" by a friend for the cabin burglaries that he, Lanz and Fleischman were involved in. Appellant denied this.

At the close of the trial, the court instructed the jury as to murder in the second degree, murder in the third degree and first- and second-degree manslaughter. The jury returned a verdict of guilty of murder in the second degree. Appellant appeals from the denial of his motion for a new trial.

Appellant has raised a number of issues that are without merit and do not warrant discussion here. A significant question as to the sufficiency of the evidence has also been raised, however. The specific issue is whether there is sufficient evidence of appellant's intent to kill Fleischman to support a conviction of second-degree murder. The state attempted to establish such intent by proceeding at trial with a theory that can be summarized as follows:

Appellant was apparently angry with Fleischman for threatening to blame appellant for the cabin burglaries and for Fleischman's confession of guilt for the burglaries that required appellant to turn himself in. The state also contends that appellant was angry with Fleischman for implicating him in connection with the damage to property at the Fleischman trailer. Given this apparent motivation, the state believes that of the two shots that were heard by the Hansons between 11:30 and 11:45 a.

m., one shot was fired by appellant to frighten Fleischman and the second and fatal shot was fired when Fleischman turned and confronted appellant while pointing the 35 caliber rifle in appellant's general direction. The state then argues that appellant let Fleischman bleed for over an hour before he called for an ambulance and sought aid from the Hansons. According to the state, appellant apparently spent the hour between the shooting and his attempt to get help by throwing Fleischman's pocket knife against the paneling in the trailer. The state contends that this delay in calling for assistance clearly indicates appellant's intent to kill Fleischman.

■ Our review of the evidence presented in this case compels us to conclude that the state did not establish appellant's intent to kill in this case. We recognize that in reviewing a verdict of guilty in a criminal case, this court must view the evidence in a light most favorable to the state. We also recognize, however, that when circumstantial evidence is the basis of the state's case, a conviction on such evidence can only be sustained when the "reasonable inferences from such evidence are consistent only with defendant's guilt and inconsistent with any rational hypothesis except that of his guilt." *State v. Kotka*, 277 Minn. 331, 334, 152 N.W.2d 445, 448 (1967), *cert. denied*, 389 U.S. 1056, 88 S.Ct. 806, 19 L.Ed.2d 853 (1968). The state's evidence in this case is wholly circumstantial and such evidence falls well short of excluding, beyond a reasonable doubt, any reasonable inference other than that of appellant's guilt. *See State v. DeZeler*, 230 Minn. 39, 52, 41 N.W.2d 313, 322 (1950).

The establishment of the number, timing and sequence of the shots fired on the day of the incident was essential to the state's case. The record reveals that the state did not establish those facts with any clarity. The unexplained number of spent shells of differing calibers found at the scene, the conflicting evidence as to the sequence of the shots fired, the uncertainty as to the number and type of weapons fired and the recovery of only a fragment of a single bullet all indicate that the state failed to establish unequivocally that appellant fired two shots at Fleischman more than an hour before he contacted authorities.

The evidence as to whether Fleischman was still alive at the time the ambulance attendants arrived also illustrates serious deficiencies in the state's case. The two attendants testified that upon their arrival on the scene at approximately 1:15 p. m., there was evidence of a heartbeat, an indication of brain function, and little or no coagulation of blood about the wound. The state's pathologist who conducted the autopsy of the victim, Dr. Richard Rottschaffer, testified that it was possible for Fleischman to have lived for as long as a couple of hours after being shot. The defense pathologist, Dr. Volker Goldschmidt, had considerably more experience than Dr. Rottschaffer. Dr. Goldschmidt is the St. Louis County Medical Examiner and has over 30 years of pathology experience. During his career, Dr. Goldschmidt conducted or participated in approximately 5,000 autopsies. After reviewing the autopsy protocol and photographs of the decedent, Dr. Goldschmidt testified that Fleischman could not have lived longer than 15 minutes after being shot. This testimony, coupled with the testimony of the ambulance attendants that the decedent exhibited certain life signs, suggests that the victim was shot no more than 15 minutes before the time the ambulance arrived around 1:15 p. m. This evidence is consistent with appellant's testimony and further indicates that the state failed to establish its theory of the case and, consequently, appellant's intent.

We must conclude, therefore, that the state's failure to establish appellant's intent requires that the conviction for second-degree murder be reversed.

■ Notwithstanding our determination that appellant's murder conviction be reversed, it is clear that appellant is not guiltless. He admitted that both he and Fleischman had smoked marijuana shortly before the shooting. He also admitted that both he and Fleischman were playing with loaded weapons in the trailer at the time

Fleischman was mortally wounded. We believe appellant's own testimony, together with the other evidence presented at trial, warrants a finding that he was culpably negligent in handling the weapons involved and that such negligence was the direct cause of Fleischman's death. This finding justifies a conviction for manslaughter in the second-degree. Minn.Stat. § 609.205(1) (1980).

Because we believe a new trial would only further delay a final resolution of this case and would inevitably result in such a finding, we deem it appropriate to reduce appellant's conviction to that of manslaughter in the second degree.

The conviction is reversed and the case is remanded to the trial court for resentencing in accordance with this decision.