STATE of Minnesota, Respondent,

v.

NGOC VAN VU, Appellant.

No. C8–82–770.

Supreme Court of Minnesota.

Nov. 10, 1983.

C. Paul Jones, State Public Defender, Minneapolis, Edgar H. Rex, Jr., Spec. Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin County Atty., Vernon E. Bergstrom, Chief-Appellate Section, Rick Osborne, Michael Richardson, Asst. County Attys., Beverly J. Wolfe, Staff Atty. by Michael Richardson, Minneapolis, for respondent.

YETKA, Justice.

Le Thi Bui was found strangled to death in her apartment on August 28, 1981. Following is a summary of the events leading up to her death.

Defendant, Ngoc Van Vu, emigrated to the United States from Viet Nam in 1975. He met Le Thi Bui, also a Vietnamese emigrant, in 1977, when both were employed by Goldberger Foods, Inc., in Minneapolis. In September 1980, defendant, Ms. Bui, and Ms. Bui's 13-year-old daughter Julie moved into an apartment at 1003 East 28th Street in Minneapolis.

Defendant's personal relationship with Ms. Bui began to deteriorate after they started living together. He told the police and a co-worker that he was "upset" with Ms. Bui because she was not a satisfactory companion. She fell asleep when he took her to movies, wouldn't eat at restaurants with him, and "never wanted to go anywhere or do anything." Julie Bui testified that defendant and Ms. Bui talked about Ms. Bui's unwillingness to go out. One of the police officers who interviewed defendant states that defendant called Ms. Bui a "sick and bothersome person." The officer testified that defendant related an incident where Ms. Bui was mistaken for defendant's mother, and defendant said this "embarrassed him greatly." Defendant denied the incident.

Ms. Bui's poor health may have added to defendant's disaffection for her. She had been consulting physicians regularly since she arrived in the United States. After she moved into the apartment with defendant, she consulted a doctor because she suspected she had tuberculosis. Ms. Bui's illness caused her to miss some work in the summer of 1981. Defendant told the police that he had no sexual relationship with Ms. Bui for several months prior to her death because of her illness.

Defendant had some financial dealings with Ms. Bui that caused him to become indebted to her. There was evidence of friction between defendant and Ms. Bui concerning repayment of certain debts, and defendant may have been able to avoid repayment of others because of Ms. Bui's death. The prosecution argues that these facts provided defendant with a motive to kill her.

In the fall of 1980, defendant began having a sexual relationship with Julie Bui. Julie testified that defendant had intercourse with her many times and that she did not consent to the relationship. She stated that she only allowed him to continue because he threatened to leave without repaying his debts to Ms. Bui and take the new car with him if she refused. Defendant testified that he never had intercourse with Julie, but admitted that he touched her breasts and pubic area and had oral sex

with her. He said that many times she agreed to his actions and that he felt remorse about the relationship.

Ms. Bui was aware that defendant was having some kind of sexual relations with Julie. Julie testified that she told her mother about it and that Ms. Bui and defendant argued about it. Defendant acknowledged that Ms. Bui was aware of the relationship, but said that they *never* argued about it. Defendant conceded though that, at one time, he thought Ms. Bui was going to tell the police about his relations with Julie. Julie testified that defendant last made advances to her 2 days before Ms. Bui was killed and that she informed her mother about it. She also testified that her mother and the defendant did not argue the night Ms. Bui was killed.

At the trial, the state placed considerable emphasis on the testimony of Jeffrey Galvan, one of defendant's co-workers, concerning conversations he allegedly had with defendant. Mr. Galvan testified that in late July of 1981, defendant told him he tried to poison his "girl friend" by putting rat poison in some pills she was taking. The rat poison did not kill her so defendant wanted to know if Galvan could obtain a more lethal poison for him. Galvan stated he could get some arsenic, and defendant offered to pay him $1,000 if he would do so—$500 on delivery of the poison, the balance after the victim died. Several days later, defendant allegedly asked Galvan if he had the poison. Galvan stated that he and defendant talked about murdering the girl friend "a couple of times" and that he once suggested that defendant kill her and make it look like part of a burglary. Defendant denied these conversations with Galvan and testified that he did not know what rat poison was.

Galvan's testimony was not corroborated by any physical evidence. The county medical examiner tested Ms. Bui's body and did not detect any residue from rat poison. He testified, however, that if a common,

commercial rat poison had been given in July, he would not expect to find residue at the time of death. An analysis of the medicines in the apartment did not reveal any that had been adulterated with poison, and the police did not find any rat poison in the apartment. However, two pieces of circumstantial evidence support Galvan's testimony. First, Julie Bui testified that when her mother's illness became worse in the summer of 1981, defendant told her Ms. Bui "was sick too much, and she wouldn't live very long." When Julie protested, defendant allegedly said to her, "Just watch." Defendant denied this statement. Second, Richard Bart, another of defendant's co-workers, testified that in the spring or early summer of 1981, defendant asked him where he could obtain some rat poison. Defendant also denied this conversation.

August 27, 1981, was the first day of the school year. Julie Bui attended classes at Sanford Junior High School until noon that day. At noon, defendant picked her up at school and they went to lunch. After lunch, they returned to their apartment so Julie could change her clothes, then went shopping until about 4:00 p.m. Defendant, Ms. Bui, and Julie had dinner together at 5:30 p.m. After dinner, Julie washed the dishes; then defendant and Julie went out shopping again. He bought her a coat and some school clothes. (Defendant testified that he bought things for Julie and took her out because Ms. Bui did not.) They returned to the apartment at about 8:00 p.m. Julie testified that Ms. Bui was alive when they returned. Defendant and Julie watched television in the bedroom until 9:00 p.m. Defendant went to sleep at 9:00, and Julie went to sleep about 9:15. Julie testified that she got up once during the night to use the bathroom; defendant stated that he slept through the night. Julie testified that the door to the apartment was locked during the night,[1] and neither heard any unusual noises.

Julie woke up at 7:00 a.m. on August 28. Ms. Bui was lying on the couch, where she

1. Defendant, Ms. Bui, Julie, and the building caretaker were the only persons with keys to

normally slept. Julie did not notice any marks on her face. At 7:30, defendant woke up. He also testified that Ms. Bui "looked fine" that morning and he too thought she was still asleep.

Defendant testified that he saw Ms. Bui's bowl and chopsticks in the kitchen sink on the morning of August 28. Based on the fact that Julie had washed the dishes the night before, defendant tried to establish that Ms. Bui was alive and ate breakfast before 7:00 a.m. on the morning of August 28.

At about 7:35, defendant drove Julie to school. He dropped her off a little before 8:00 and returned to the apartment about 8:15. Defendant stated that when he returned to the apartment, the door was unlocked. He entered and called to Ms. Bui. When she failed to answer, he tried to wake her up and noticed blood on her face. He became frightened and immediately returned to Julie's school, where he told the secretary that Ms. Bui was dead and asked for Julie. Defendant was crying when he arrived at the school. Julie came to the principal's office and defendant told her that her mother was dead. Julie did not show any emotion. Defendant asked an employee of the school to contact the police, then returned to the apartment with Julie. Julie testified that defendant said to her in the car on the way home, "See, your mom, she's sick so much, now she's dead." Defendant denied making the statement and said that Julie made the reference to Ms. Bui's illness.

When defendant and Julie arrived at the apartment, the police and rescue squad were already there. Patrick Carik, a patrolman with the Minneapolis Police Department, testified that when he arrived at defendant's apartment, Ms. Bui's body was lying on the couch. It was cold to the touch, and the hair was "pushed into the face". After Officer Carik took Ms. Bui's identification, defendant asked him if he

would call Ms. Bui's life insurance company. Officer Carik told defendant that was not a police function. Later in the morning, defendant again asked the officer to contact Ms. Bui's insurer. Defendant testified that he asked the police to contact the insurance company because he did not speak English and did not know how to proceed.

William Noble, a lieutenant in the Homicide-Robbery Division of the Minneapolis Police Department, testified that he arrived at the apartment at about 9:50 a.m. on August 28. He saw Ms. Bui's body and also testified that the hair was "pressed onto her face." He and his partner conducted an investigation and found no evidence of a break-in and no indication that anyone had entered the apartment other than by the entry door for a long period of time.

Dr. Eric Rayhut, Deputy Medical Examiner at the Hennepin County Medical Examiner's Office, examined Ms. Bui's body and performed an autopsy. He found that Ms. Bui was 4′11″ tall and weighed 71 pounds at the time of death. There were several cuts and abrasions on her face and neck and cuts on the inside of her lips where the lips had been pressed against the teeth. Small hemorrhages on her eyes indicated that there had been compression of her neck and similar hemorrhages were discovered in her larynx and lungs. On the basis of these findings, Dr. Rayhut gave his opinion that death was caused by manual strangulation or suffocation. The time of death was estimated at between 9:00 p.m. August 27 and 1:00 a.m. August 28. This estimate was based on consideration of many factors, including stiffening of the body, gravitation of blood to lower parts of the body, body temperature, stomach contents, and the amount of potassium in the fluid of the eyes.

On cross-examination, the defense attempted to demonstrate a reasonable possibility that Julie Bui was the killer. Dr. Rayhut admitted that there was no damage

---

the apartment. Julie testified that she once lost a key to the apartment, but it had no

marks on it identifying the apartment.

to the small bones and cartilage in the victim's neck and rated the amount of force applied to kill Ms. Bui at "five or six" on a "scale of zero to ten" (T. 202). Defendant then asked whether a person of Ms. Bui's size could have been manually strangled by a girl 5′0″ tall, weighing 90–100 pounds.[2] Dr. Rayhut testified that it would be possible if the victim was incapacitated by alcohol or drugs, but if the victim was "approximately equivalent to his or her attacker" and was "fighting for his or her life," it would be impossible.

The defense also tried to show a possibility that death actually occurred between 7:30–8:15 a.m. on August 28. Dr. Rayhut admitted that if the victim had eaten breakfast at 5:00 a.m., the stomach contents were consistent with death at 7:30 a.m. He also admitted that the amount of rigor mortis present could theoretically be consistent with death at 7:30 a.m., but stated that rigor mortis so soon after death would be "very uncommon." Finally, the defense quoted from a medical textbook to prove that the body temperature was more consistent with death at 7:30 a.m. than at 9:00 p.m.–1:00 a.m. the previous night. Dr. Rayhut flatly disagreed with the statements in the textbook, calling them "simplistic" and out of date. He explained recent work on the relationship of body temperature to time of death and stated that the temperature of Ms. Bui's body was definitely inconsistent with death at 7:30 a.m. on August 28. The defense did not introduce any other expert testimony to prove that Julie Bui was physically capable of the killing or to prove that death occurred at 7:30 a.m. on August 28.

On August 29, the day after Ms. Bui was killed, Julie Bui was interviewed by Sergeant Hinchcliff of the Minneapolis Police. At that time, she stated that Mr. Vu first tried to have sex with her in the fall of 1980, and that he had sexual intercourse with her many times.

Defendant was interviewed by Lieutenant Dennis Lundberg, Minneapolis Police Department, on August 30. Lundberg drove to the apartment where defendant was staying and defendant followed him back to the police station. Lundberg stated that he informed defendant of his *Miranda* rights when they arrived at the police station and that defendant said he understood his rights and was willing to talk to the police. Defendant testified that he was not given the *Miranda* warnings.

Lundberg informed defendant that Ms. Bui had been killed, that she did not die from natural causes. He testified that this information "didn't seem to affect (defendant) at all." Lundberg asked defendant if he killed Ms. Bui, and defendant said he did not. Defendant told Lundberg that he had "touched" Julie Bui and had oral sex with her, but stated that he had not had sexual intercourse with her. Lundberg testified that defendant told him during the interview that the doors to the apartment were locked the night of August 27–28. Defendant denied making this statement. At the completion of the interview, defendant cooperated with the police in giving his fingerprints and having his photograph taken.

On September 10, 1981, Lieutenant John Searles, Minneapolis Police Department, Homicide Division, called defendant and asked him to come to the police station for an interview. Defendant came to the station promptly. Searles testified that when defendant arrived, he was given a standard *Miranda* warning. Defendant allegedly said he did not understand the "big words" so Searles rephrased the warning as follows: "You don't have to tell me anything. You don't have to talk to me. If you do talk to me, I can use anything you say in court as evidence against you. You can have a lawyer here now or anytime when I'm questioning you and if you can't afford one, we'll give you one for nothing, no

**2.** Julie Bui testified that she was 5′ 0″ tall and weighed between 90–100 pounds at the time of her mother's death. Defendant was 6′ 0″ tall and weighed 175 pounds on August 28, 1981. He testified that he exercised by lifting weights at that time.

money." Searles testified that he asked defendant if he understood his rights, and defendant answered that he did. Searles admitted that he did not explain the meaning of the words "lawyer," "court of law," or "evidence." Defendant testified that Searles never gave him any of the above warnings.

Searles testified that after informing defendant of his rights, he asked defendant if he wanted to continue the interview. Defendant responded, "I no kill her, she's my friend." Searles then accused defendant of killing Ms. Bui. He said that he knew defendant had killed her, he knew how and why, and that he knew defendant attempted to kill her before with rat poison. Defendant denied the accusation. Searles testified that defendant acknowledged that the doors to the apartment were locked, that only defendant and Julie were inside with Ms. Bui, and that no one else had keys to the apartment. When Searles then asserted that Julie didn't have the strength to kill Ms. Bui, that defendant was the only one capable, defendant allegedly remained silent. Searles then arrested defendant and placed him in custody.

On February 16, 1982, the district court held an omnibus hearing on several defense motions, including a motion to suppress certain statements that defendant made to the police. Defendant argued that the statements were inadmissible because the state did not prove that he voluntarily waived his *Miranda* rights. Officers Lundberg and Searles both testified that they informed defendant of his right to remain silent, to have an attorney present during questioning, without cost if he could not afford one, and that any statement he gave to the police could be used in court as evidence against him. Defendant testified that he was never informed of his rights, but at the hearing, his attorney only argued that defendant was unable to waive his rights effectively because of his limited understanding of the English language.

The district court heard the testimony as to defendant's ability to understand English from the two police officers who interviewed him. Both officers mentioned difficulties that defendant had understanding some words, but both gave their opinion that defendant understood the conversation and both stated that no questions were asked until after defendant stated that he understood his rights. Defendant gave extensive testimony at the hearing, extending over 2 days and filling 45 pages of transcript.

Based on the above evidence and its observation of defendant, the court ruled that the *Miranda* warnings were given and that defendant understood them sufficiently to be able to waive his rights effectively. Defendant's motion to suppress was denied.

The issues raised on appeal are:

I.  Should defendant's conviction be reversed because the trial court improperly admitted evidence of his statements to the police?

II.  Was the circumstantial evidence of defendant's guilt sufficient to exclude beyond a reasonable doubt any reasonable inference other than that of defendant's guilt?

■ 1. Before the state can introduce incriminating statements made by a defendant during custodial interrogation, it has the burden of proving that defendant "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966) (citing *Escobedo v. Illinois,* 378 U.S. 478, 490, n. 14, 84 S.Ct. 1758, 1765, n. 14, 12 L.Ed.2d 977 (1964)). The rule in Minnesota is that the state has carried its burden of proof if it shows that the warning was given and defendant stated that he understood his rights. However, if there is other credible evidence indicating that the waiver was not "knowing and intelligent," the state must produce additional evidence and the trial court must make a subjective factual inquiry to determine, on the basis of all the

circumstances, whether the waiver was effective. *State v. Kulseth,* 333 N.W.2d 635, 637 (Minn.1983); *State v. Linder,* 268 N.W.2d 734, 735 (Minn.1978).

We believe the trial court was correct in holding an extensive hearing to evaluate whether defendant knowingly and intelligently waived his *Miranda* rights. The court was in the best position to judge the credibility of the defendant and the other witnesses. On the particular facts in this case, we hold that there was sufficient evidence to support a finding that defendant was given *Miranda* warnings and understood them. It is noteworthy that, before the day of the murder, the defendant appears to have had little difficulty using the English language either at work or at home. His comprehension appears to have become increasingly difficult as trial approached. We do feel compelled to state, however, that in the case of recent immigrants who appear to have some difficulty with a new language, the police and the trial court would be wise to engage an interpreter before interrogation so that this issue need never arise again in Minnesota.

2. When reviewing a verdict of guilty in a criminal case, the court must consider the evidence in the light most favorable to the state. It must assume that the jury believed the state's witnesses and disbelieved everything which contradicted their testimony. *State v. Walhberg,* 296 N.W.2d 408, 411 (Minn.1980) (citing *State v. Thompson,* 273 Minn. 1, 36, 139 N.W.2d 490, 515, *cert. denied,* 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966)). The evidence of defendant's guilt in this case was entirely circumstantial. A conviction based on such evidence can only be sustained when "the reasonable inferences from such evidence are consistent only with defendant's guilt and inconsistent with any rational hypothesis except that of his guilt." *State v. Threinen,* 328 N.W.2d 154, 156 (Minn.1983) (citing *State v. Gibbons,* 305 N.W.2d 331, 336 (Minn.1981), et al.).

The court finds that "the reasonable inferences" from the evidence in this case "are consistent with defendant's guilt." The issue in this appeal is whether those inferences are consistent only with defendant's guilt or whether another *rational* hypothesis exists indicating that some other person committed the crime. We hold that the evidence against defendant is so strong that it precludes any rational possibility that another person killed Ms. Bui.

The defendant's conviction is affirmed.